George A. LLOYD and Janet B. Wolfe, etc., Plaintiffs-Appellants,

v.

The REGIONAL TRANSPORTATION AUTHORITY and the Chicago Transit Authority, Defendants-Appellees.

No. 76–1524.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 1, 1976.

Decided Jan. 18, 1977.

Neil K. Quinn, Walter J. Kendall, Chicago, Ill., for plaintiffs-appellants.

Norman J. Barry, Joseph P. Della Maria, Jr., and Ronald F. Bartkowicz, Chicago, Ill., for Chicago Transit Authority.

Don H. Reuben, James C. Munson, Chicago, Ill., for Regional Transportation Authority.

Before CUMMINGS and TONE, Circuit Judges, and GRANT, Senior District Judge.*

CUMMINGS, Circuit Judge.

■ This class action was filed under the Civil Rights Act of 1871 (42 U.S.C. § 1983),[1] the Rehabilitation Act of 1973 (29 U.S.C. §§ 701 et seq. ), the Architectural Barriers Act of 1968 (42 U.S.C. §§ 4151 and 4152). and unspecified regulations promulgated under the statutes.[2] Plaintiffs also relied on various sections of the Constitution but now rest their constitutional argument only on the Equal Protection Clause of the Fourteenth Amendment.

---

\* Senior District Judge Robert A. Grant of the Northern District of Indiana is sitting by designation.

1. Plaintiffs no longer rely on 42 U.S.C. § 1983 (see reply br. 7), apparently because municipal corporations like defendants are outside its ambit. *City of Kenosha v. Bruno,* 412 U.S. 507, 513, 93 S.Ct. 2222, 37 L.Ed.2d 109.

2. In their appellate brief (at 11–13) plaintiffs also rely on a 1975 amendment to Section 165 of the Federal-Aid Highway Act of 1973, providing that the Secretary of Transportation "shall not approve any program or project

\* \* \* [not] requiring access to public mass transportation facilities, equipment and services for elderly or handicapped persons" which is funded under certain specified sections of Title 23 of the United States Code (23 U.S.C.A. § 142 note; 88 Stat. 2283). The 1975 amendment defined the handicapped to "includ[e] those who are nonambulatory wheelchair-bound and those with semiambulatory capabilities." *Id.* However, since this provision was not cited in the complaint and barely mentioned in the district court's opinion, we will not consider it.

■ The named plaintiffs are George A. Lloyd, a quadriplegic who has been confined to a wheelchair since 1953, and Janet B. Wolfe, who is "mobility-disabled" because of a chronic pulmonary dysfunction. They sued on behalf of a class of all mobility-disabled persons in the northeastern region of Illinois. The two defendants are the Regional Transportation Authority (RTA),[3] which provides public transportation and assists in the public mass transportation system in that region, and the Chicago Transit Authority (CTA),[4] which operates a mass transportation system in the Chicago metropolitan area. The complaint alleges that the suing class is unable to use defendants' public transportation system because of physical disabilities. Plaintiffs aver on information and belief that defendants are in the process of planning for the purchase of new transportation equipment utilizing federal funds[5] and that, unless defendants are compelled to take affirmative action, the transportation system will continue to be inaccessible to the mobility-disabled.

The complaint sets out four causes of action. First, plaintiffs assert that defendants have violated Section 16 of the Urban Mass Transportation Act of 1964 (49 U.S.C. § 1612) because they have not met the transportation needs of handicapped persons. Secondly, plaintiffs charge that defendants have violated Section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794) because, by reason of their handicaps, plaintiffs have been denied the meaningful usage of defendants' federally financed mass transportation facilities. Thirdly, plaintiffs claim that defendants have not complied with Sections 1 and 2 of the Architectural Barriers Act of 1968 (42 U.S.C. §§ 4151 and 4152) because they have not designed vehicular facilities permitting ready access to physically handicapped persons. Finally, defendants' denial of public transportation system access to plaintiffs and their class is said to violate the Fourteenth Amendment's Equal Protection Clause.

The plaintiffs sought a preliminary injunction to prevent the defendants from designing or placing into operation any new federally funded facilities unless the facilities were accessible to all mobility-disabled persons. Plaintiffs also prayed for a mandatory injunction compelling the defendants to make the existing transportation system accessible to the mobility-disabled.

The district court filed a memorandum opinion granting the defendants' motions to dismiss on the ground that the three statutes in question do not confer a private right of action. The opinion stated that the only substantial constitutional claim of plaintiffs was founded on the Equal Protection Clause but that it was inapplicable because

"[d]efendants have not created any inequalities of treatment. They are not alleged to be providing handicapped persons with any lesser facilities than other persons."[6]

---

**3.** The RTA is a municipal corporation established pursuant to Ill.Rev.Stat.1975, ch. 111⅔, §§ 701.01 *et seq.*

**4.** The CTA is a municipal corporation established pursuant to Ill.Rev.Stat.1975, ch. 111⅔, §§ 301 *et seq.*

**5.** Reading the complaint liberally as we must on a motion to dismiss, we deem it possible that plans for the purchase of new equipment on June 5, 1975, the date of the complaint, were not all consummated at the level of final approval of federal funding before the effective date of the Urban Mass Transportation Administrator's regulations on May 31, 1976. See also note 30 *infra.*

**6.** The district judge found it unnecessary to decide whether the Secretary of Transportation or his delegates were indispensable parties. Similarly, he did not pass on whether the Secretary of Health, Education and Welfare and the Urban Mass Transportation Administrator had to be named as defendants, as urged by the Urban Mass Transportation Administrator

We vacate and remand.

## SECTION 504 CONFERS AFFIRMATIVE RIGHTS

■ Plaintiffs and two amici curiae [7] rely on Section 504 of the Rehabilitation Act of 1973 as giving plaintiffs the right to file a private action to enforce compliance with the statutes relied upon in the complaint and the recent regulations of the Urban Mass Transportation Administration.[8] Section 504 provides:

"No otherwise qualified handicapped individual in the United States, as defined in section 7(6), shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" (29 U.S.C. § 794).

This provision closely tracks [9] Section 601 of the Civil Rights Act of 1964,[10] which was construed in *Lau v. Nichols,* 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1. There a unanimous Supreme Court held that Section 601 provided a private cause of action. See also *Bossier Parish School Board v. Lemon,* 370 F.2d 847, 852 (5th Cir. 1969), certiorari denied, 388 U.S. 911, 87 S.Ct. 2116, 18 L.Ed.2d 1350. While adverting to regulations and guidelines issued by the Department of Health, Education and Welfare (HEW) pursuant to Section 602 of the Act [11] and the respondent school district's contractual agreement to comply with Title VI of the Civil Rights Act of 1964 and the regulations thereunder,[12] Justice Douglas (speaking for himself and Justices Brennan, Marshall, Powell and Rehnquist) stated, in reversing the court of appeals, that "[w]e do not reach the Equal Protection Clause argument which has been advanced but rely solely on § 601." 414 U.S. at 566, 94 S.Ct. at 788. The concurring opinion of Justice Stewart (with whom the Chief Justice and Justice Blackmun joined) relied on Section 601 and the HEW regulations and guidelines and mentioned that plaintiffs there could concededly sue as third-party beneficiaries of said contract. Finally, Justice Blackmun (with whom the Chief Justice joined) stated that because the plaintiff class involved 2800 school children, he concurred in the holding that the San Francisco School District could not continue to teach students in English without teaching English to Chinese-speaking children or giving their classes in the Chinese language.[13]

---

(who filed an amicus curiae brief with us) and by the CTA.

7.  They are the National Center for Law and the Handicapped, Inc. of South Bend, Indiana, and a group of eight organizations representing disabled persons, whose counsel was the Public Interest Law Center of Philadelphia.

8.  Those regulations were issued on April 27, 1976, and made effective May 31, 1976. They appear in 49 C.F.R. §§ 609.1–609.25 and 613.-204 and in 41 F.R. 18239–18241 and 18234 (April 30, 1976). Two appendices were also added. 49 C.F.R. §§ 609.15(a), (b) and (c) were revised effective October 12, 1976. 41 F.R. 45842 (October 18, 1976).

9.  Indeed, Section 504 had its genesis in an abortive attempt by Congressman Vanik to include the handicapped within the strictures of the Civil Rights Act of 1964 itself. In floor debate on the Rehabilitation Act of 1973, he expressed pleasure that his language was included in what was to become Section 504. 119 Cong. Rec. 7114 (1973).

10.  Section 601 of the Civil Rights Act of 1964 provides:

"No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance" (42 U.S.C. § 2000d).

11.  Section 602 provides:

"Each Federal department and agency which is empowered to extend Federal financial assistance to any program or activity, by way of grant, loan, or contract other than a contract of insurance or guaranty, is authorized and directed to effectuate the provisions of section 2000d of this title with respect to such program or activity by issuing rules, regulations, or orders of general applicability which shall be consistent with achievement of the objectives of the statute authorizing the financial assistance in connection with which the action is taken * * *" (42 U.S.C. § 2000d–1).

12.  45 C.F.R. pt. 80.

13.  A perceived importance in the number of discriminatees seeking relief has caused one court to consider the numerosity of the plaintiff class as a limitation of *Lau. Serna v. Portakes*

Because of the near identity of language in Section 504 of the Rehabilitation Act of 1973 and Section 601 of the Civil Rights Act of 1964, *Lau* is dispositive. Therefore, we hold that Section 504 of the Rehabilitation Act, at least when considered with the regulations which now implement it, establishes affirmative rights and permits this action to proceed.[14]

Judge Flaum held that *Lau* was not controlling because this case was devoid of analogs to the HEW guidelines there involved. In the district court's view, the "obligation to provide special programs did not flow from the cited statutory language [Section 601 of the Civil Rights Act of 1964], but rather from Health, Education and Welfare guidelines which were enacted pursuant to the additional statutory section, § 2000d–1 [Section 602 of the Civil Rights Act of 1964]." Even though the opinion of the Court in *Lau* can be read as authority for allowing this action to proceed under Section 504 of the Rehabilitation Act alone, developments subsequent to the district

court's opinion have provided a virtual one-to-one correspondence between the conceptual props supporting the concurring opinions in *Lau* and the elements of the instant case.

Here the conceptual analog of Section 602 of the Civil Rights Act of 1964 came into being on April 28, 1976, in the form of Executive Order 11914, 41 F.R. 17871 (April 29, 1976). The Executive Order authorizes HEW and other federal agencies dispensing financial assistance to adopt rules, regulations and orders to ensure that recipients of federal aid are in compliance with Section 504. If compliance cannot be secured voluntarily, it may be compelled by suspension or termination of federal assistance after a hearing or by "other appropriate means authorized by law." HEW is given the responsibility of establishing standards for who are "handicapped individuals" and for determining what are "discriminatory practices" as well as coordinating the implementation of Section 504 by all federal agencies. While the Rehabilitation Act itself contains no express directive to issue regulations,[15]

---

*Municipal Schools,* 499 F.2d 1147, 1154 (10th Cir. 1974).

**14.** Accord: *Gurmankin v. Costanzo,* 411 F.Supp. 982 (E.D.Pa.1976); *Hairston v. Drosick,* 423 F.Supp. 180 (S.D.W.Va.1976); *Rhode Island Society for Autistic Children v. Board of Regents,* Civil Action No. 5081 (D.R.I. August 1, 1975); *Cherry v. Mathews,* 419 F.Supp. 922 (D.D.C.1976); *Sites v. McKenzie,* 423 F.Supp. 1190, (N.D.W.Va.1976). See also *Bartels v. Biernat,* 405 F.Supp. 1012 (E.D.Wis.1975). To the extent that *Young v. Coleman,* Civil Action No. H–76–201 (D.Conn. Dec. 17, 1976), may be *contra,* we disagree therewith. The district judge did not realize that the Urban Mass Transportation Administrator's regulations had been issued in part under Section 504 (mem. op. 9), which was his reason for distinguishing *Lau v. Nichols, supra.* He left open the question whether Section 504 authorizes a private right of action in circumstances like these (mem. op. 9, 10). Also, the defendants there satisfied him that they were making good faith efforts to comply with the Urban Mass Transportation Act (mem. op. 8), and the State of Connecticut Department of Transportation represented that it would comply with the April and October requirements of the Urban Mass Transportation Administrator (n. 5).

**15.** However, the legislative history of the 1974 Rehabilitation Act Amendments explicitly contemplates an Executive Order such as 11914

which would consolidate in HEW the government-wide responsibility of issuing regulations to implement Section 504:

"It is intended that sections 503 and 504 be administered in such a manner that a consistent, uniform, and effective Federal approach to discrimination against handicapped persons would result. Thus, Federal agencies and departments should cooperate in developing standards and policies so that there is a uniform, consistent Federal approach to these sections. The Secretary of the Department of Health, Education and Welfare, because of that Department's experience in dealing with handicapped persons and with the elimination of discrimination in other areas, should assume responsibility for coordinating the section 504 enforcement effort and for establishing a coordinating mechanism with the Secretary of the Department of Labor to ensure a consistent approach to the implementation of sections 503 and 504. The conferees fully expect that H.E.W.'s section 504 regulations should be completed by the close of this year. Delay beyond this point would be most unfortunate since the Act (P.L. 93–112) was enacted over one year ago—September 26, 1973.

"The conferees noted, and the Committee reiterates, that Executive Order No. 11758, section 2, delegates to the Secretary of Labor the responsibility for carrying out the responsibilities embodied in section 503 of the Re-

the 1974 Amendments to the Act generated a legislative history which indicates that Congress contemplated speedy implementation of Section 504 through regulations. See S.Rep. No. 93–1139, 93d Cong., 2d Sess. 24–25 (1974); H.R.Rep. No. 32–1457, 93d Cong., 2d Sess. 27–28 (1974); S.Rep. No. 32–1297, 93d Cong., 2d Sess. 39–40 (1974). "In review of the foregoing, [it can be concluded] that the [HEW] Secretary is required to promulgate regulations effectuating § 504." *Cherry v. Mathews,* 419 F.Supp. 922 (D.D.C., 1976).[16]

Forty days after the district court's opinion was issued, the Urban Mass Transportation Administrator promulgated final regulations, in part under the authority of Section 504. These regulations and various accompanying guidelines are squarely couched in affirmative language. Thus new regulation 49 CFR § 613.204 provides:

"*Additional criteria for Urban Mass Transportation Administrator's approvals under 23 CFR 450.320.*

"The Urban Mass Transportation Administrator will grant project approvals pursuant to 23 CFR 450.320(a)(3) *only if:*

"*(a) The urban transportation planning process exhibits satisfactory special efforts in planning public mass transportation facilities and services that can be utilized by elderly and handicapped persons* ; and

"(b) The annual element of the transportation improvement program developed pursuant to 23 CFR 450.118 and submitted after September 30, 1976, contains projects or project elements de-

signed to benefit elderly and handicapped persons, *specifically including wheelchair users and those with semi-ambulatory capabilities* ; and

(c) After September 30, 1977, *reasonable progress* has been demonstrated in implementing previously programmed projects." (Emphasis supplied.)

Advisory information issued simultaneously, to be added to the appendix to 23 CFR Part 450, Subpart A, sets forth general guidance on the meaning of "special efforts" in planning:

"The urban transportation planning process must include special efforts to plan public mass transportation facilities and service that can effectively be utilized by elderly and handicapped persons. As used in this guidance, the term 'special efforts' refers both to service for elderly and handicapped persons in general and specifically to service for wheelchair users and semiambulatory persons. *With regard to transportation for wheelchair users and others who cannot negotiate steps, 'special efforts' in planning means genuine, good-faith progress in planning service for wheelchair users and semiambulatory handicapped persons that is reasonable by comparison with the service provided to the general public and that meets a significant fraction of the actual transportation needs of such persons within a reasonable time period."* (Emphasis supplied.)

Further advisory information published as an appendix to 49 CFR Part 613, Subpart B, gives several examples of a level of effort that will be deemed to satisfy the special efforts requirement.[17] While the guidelines

habilitation Act of 1973, and a similar delegation of responsibility to the Secretary of HEW is urged to carry out on a Government-wide basis those responsibilities embodied in section 504." 4 U.S.Code Cong. & Admin. News, p. 6391 (1974).

**16.** The district court in *Cherry* chose not to set a date when the final 504 regulations must issue but did retain jurisdiction to ensure that "no further unreasonable delays affect the promulgation of regulations under § 504." No appeal was taken from the July 19 memorandum opinion.

**17.** The examples given are the following:

"1. A program for wheelchair users and semiambulatory handicapped persons that will involve the expenditure of an average annual dollar amount equivalent to a minimum of five percent of the section 5 [49 U.S.C. § 1604] apportionment to the urbanized area. These 'five percent funds' may be derived from sources other than section 5. The term 'average' permits lower expenditure years to be balanced by higher expenditure years but does not permit an initial delay in implementing projects. The term 'section 5 apportionment' refers to UMTA's formula apportionment for areas with a population of 200,000 or more and to the Governor's appor-

do not purport to be regulatory standards or minimums,[18] they do suggest a commitment to an affirmative remedial program of substantial scope. The most recently issued Urban Mass Transportation Administrator's regulation (49 CFR § 609.15(b), 41 F.R. 45842 (October 18, 1976)) provides in pertinent part that:

"procurement solicitations shall provide for a bus design which permits the addition of a wheelchair accessibility option and shall require an assurance from each bidder that it offers a wheelchair accessibility option for its buses. The term 'wheelchair accessibility option' means a level change mechanism (e. g., lift or ramp), sufficient clearances to permit a wheelchair user to reach a securement location, and at least one wheelchair securement device."

Indeed, in oral argument the CTA conceded that the regulations created an affirmative duty on federal grant recipients.

tionment for areas with a population of 200,-000 or more and to the Governor's apportionment for areas with a population under 200,-000. Projects that qualify as local 'special efforts' for wheelchair users and other semiambulatory persons under the initial paragraphs of this advisory information would be counted in computing the five percent.
"2. Purchase of only wheelchair-accessible new fixed route equipment until one-half of the fleet is accessible, or in the alternative, provision of a substitute service that would provide comparable coverage and service levels.
"3. A system, of any design, that would assure that every wheelchair user or semiambulatory person in the urbanized area would have public transportation available is requested for 10 round-trips per week at fares comparable to those which are charged on standard transit buses for trips of similar length, within the service area of the public transportation authority. The system could, for example, provide trip coupons to individuals who would then purchase the needed service." 41 F.R. 18234 (April 30, 1976).

18. 41 F.R. 18234 (April 30, 1976). However, the same appended material does describe some qualitative boundaries to the special efforts concept:
"Projects funded by UMTA under section 16(b)(2) [49 U.S.C. § 1612(b)(2)] may be identified as deriving from local special efforts to meet the needs of wheelchair users and semi-

Four months after the district judge's opinion, HEW issued proposed regulations implementing Section 504.[19] Paralleling 45 CFR § 80.3(b)(1)(ii) and (iv), the provisions explicitly mentioned by eight Justices in *Lau,* proposed regulations 49 CFR §§ 84.-4(b)(1)(ii) and (iv) specify that recipients of federal financial assistance may not

"(ii) Provide a qualified handicapped person with aid, benefit, or service which is not *as effective as that provided to others*;

\*   \*   \*   \*   \*   \*

"(iv) Otherwise limit a qualified handicapped person in the enjoyment of any right, privilege, advantage or opportunity enjoyed by others receiving an aid, benefit or service." (Emphasis supplied.)

Moreover § 84.4(b)(2) establishes that

"A recipient may not provide different or separate aid, benefits or services to handicapped persons unless such action is necessary to provide qualified handicapped persons with aid, benefits, or services *which are as effective as those provided to others*." (Emphasis supplied.) [20]

ambulatory persons only to the extent that the following four conditions are met: (1) the service and vehicles serve wheelchair users and semiambulatory persons; (2) the service meets a priority need identified in this planning process; (3) the service is not restricted to a particularized organizational or institutional clientele; and (4) any fares charged are comparable to those which are charged on standard transit buses for trips of similar length." *Id.*

19. HEW's proposed regulations appear at 41 F.R. 29560–29567 (July 16, 1976) and are intended to become 45 CFR §§ 84.1–84.54. Notice of Proposed Rulemaking was published at 41 F.R. 20296 (May 17, 1976). Even this early in the rulemaking process, the HEW Secretary conceded that Section 504 created individual rights:
"Thus, while we recognize that the statute creates individual rights, the statute is ambiguous as to the specific scope of these rights." *Id.*

20. Sections 84.4(b)(i) and (b)(2) were redrafted from the language appearing in the Nature of Intent of Proposed Rulemaking of May 17, 1976, because the commentators objected to the draft regulations' emphasis on different treatment. Thus "as effective as" was substituted for "comparable" in the May 17 draft.

Finally, pending the adoption of a new procedural regulation consolidating all of the enforcement procedures implementing the civil rights statutes for which HEW has enforcement responsibilities,[21] the "procedural provisions of the title VI regulation, which may be found at 45 CFR Part 80, will be incorporated by reference into the section 504 regulations for use during the interim." 41 F.R. 29548 (July 16, 1976). The regulations thus reduce to concrete terms the abstract words of section 504.

Taken together with the numerosity of the class,[22] every element of the two [23] concurring opinions in *Lau* is also satisfied under the statutory and administrative framework of the instant case. The existence of affirmative rights under Section 504 necessarily follows, for, to paraphrase Justice Douglas in *Lau*:

> "Under these [federal] standards there is no equality of treatment merely by providing [the handicapped] with the same facilities [as ambulatory persons] * * *; for [handicapped persons] who [can] not [gain access to such facilities] are effectively foreclosed from any meaningful [public transportation]." 414 U.S. at 566, 94 S.Ct. at 788.[24]

The accompanying advisory information outlined the intent of this change:

> "[The new terminology] is intended to encompass the concept of equivalent as opposed to identical, services and to acknowledge the fact that in order to meet the individual needs of handicapped persons to the same extent that the corresponding needs of nonhandicapped persons are met, adjustments to regular programs or the provision of different programs may sometimes be necessary. For example, a welfare office that uses the telephone for communicating with its clients must provide alternative modes of communicating with its deaf clients. This standard parallels the one established under title VI of Civil Rights Act of 1964 with respect to the provision of educational services to students whose primary language is not English. See '*Lau v. Nichols*', 414 U.S. 563, 94 S.Ct. 786, 39 L.Ed.2d 1 (1974). The rewording of this provision is intended to emphasize that, although separate services may be required in some instances, the provision of unnecessarily separate or different services is discriminatory." 41 F.R. 29551 (July 16, 1976).

Cf. *Griggs v. Duke Power Co.*, 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158.

## PRIVATE RIGHT OF ACTION

■ Having demonstrated that *Lau v. Nichols* is conclusive on the question of the existence of affirmative rights under Section 504 and the regulations, we now turn to a consideration whether a private cause of action may be implied to vindicate these rights. As the parties have acknowledged, *Cort v. Ash*, 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26, sets out the four factors relevant to determining whether a private remedy is implicit in a statute not expressly providing one. They are:

> "First, is the plaintiff 'one of the class for whose *especial* benefit the statute was enacted,' (emphasis supplied)—that is, does the statute create a federal right in favor of the plaintiff? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one? Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff? And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would

21. On April 22, 1976, HEW released an Intent to Issue Notice of Proposed Rulemaking styled "Consolidated Procedural Rules for Administration and Enforcement of Certain Civil Rights Laws and Authorities." 41 F.R. 18394 (May 3, 1976).

22. The complaint alleges that there may be hundreds of thousands of mobility-disabled persons in the northeastern region of Illinois.

23. Justice White concurred without comment in the *Lau* result without joining either in the opinion of the Court or in the concurring opinions authored by Justices Stewart and Blackmun.

24. HEW's May 17, 1976, statement of policy on interpreting Section 504 acknowledges as much:

> "Handicapped persons may require different treatment in order to be afforded equal access to federally assisted programs and activities, and identical treatment may, in fact, constitute discrimination." 41 F.R. 20296 (May 17, 1976).

be inappropriate to infer a cause of action based solely on federal law?" (Citations omitted.)

Applying the *Cort* factors here leads to the conclusion that a private cause of action must be implied from Section 504.

(1) Plaintiffs of course are among the class specifically benefited by the enactment of the statute. As demonstrated above, Section 504 establishes affirmative private rights. In particular, these rights apply to transportation barriers impeding handicapped individuals.[25] 29 U.S.C. § 701(11).

(2) While the 1973 legislative history of Section 504 is bereft of much explanation,[26] the legislative history of the Rehabilitation Act Amendments of 1974[27] casts light on the original Congressional intent. These amendments, *inter alia*, redefined the term "handicapped individual" as used in Section 504 and, as clarifying amendments, have cogent significance in construing Section 504. See *Red Lion Broadcasting Co., Inc. v. Federal Trade Commission*, 395 U.S. 367, 380–381, 89 S.Ct. 1794, 23 L.Ed.2d 371. It is noteworthy that the Senate Report was submitted on November 26, 1974, and the *Lau* opinion construing Section 601 of the Civil Rights Act of 1964 was handed down on January 21 of that year and certainly known by the Senate Committee.[28] Indeed, the report of the Senate Labor and Public Welfare Committee notes that the

"new definition applies to section 503, as well as to section 504, in order to avoid limiting the affirmative action obligation of a Federal contractor to only that class

of persons who are eligible for vocational rehabilitation services. * * * Where applicable, section 504 is intended to include a requirement of affirmative action as well as a prohibition against discrimination." 4 U.S.Code Cong. & Admin. News, p. 6390 (1974).

The Committee continues by stating that Section 504's similarity to Section 601 of the Civil Rights Act of 1964 was not accidental:

"Section 504 was patterned after, and is almost identical to, the antidiscrimination language of section 601 of the Civil Rights Act of 1964, 42 U.S.C. 2000d–1 (relating to race, color, or national origin), and section 901 of the Education Amendments of 1972, 42 U.S.C. 1683 (relating to sex). The section therefore constitutes the establishment of a broad government policy that programs receiving Federal financial assistance shall be operated without discrimination on the basis of handicap. It does not specifically require the issuance of regulations or expressly provide for enforcement procedures, but it is clearly mandatory in form, and such regulations and enforcement are intended." (4 U.S.Code Cong. & Admin. News, p. 6390 (1974)).

Further, the scope of the enforcement mechanism to result from such conscious parallelism did not escape comment:

"The language of section 504, in followig [sic] the above-cited Acts, further envisions the implementation of a compliance program which is similar to those Acts, including promulgation of regulations providing for investigation and review of

---

**25.** Indeed, one of the principal purposes of the 1974 Rehabilitation Act Amendments was to include within Section 504 individuals who may have been unintentionally excluded from its protection by the original definition of handicapped individuals which over-emphasized employability. In the Senate Report, it was made plain that *inter alia*:

"Section 504 was enacted to prevent discrimination against all handicapped individuals, regardless of their need for, or ability to benefit from vocational rehabilitation services, in relation to Federal assistance in * * * transportation * * * programs." 4 U.S. Code Cong. & Admin.News, p. 6388 (1974).

**26.** The 1973 legislative history leaves ambiguous whether or not Section 504 is a mandatory provision. See 2 U.S.Code Cong. & Admin. News, pp. 2123, 2143 (1973).

**27.** Pub.L. 93–516, 88 Stat. 1617.

**28.** *Lau* is also referred to in the introduction to HEW's proposed regulations (41 F.R. 29551, July 16, 1976). See note 20 *supra.* The third-party beneficiary theory advanced by Justice Stewart in *Lau* (414 U.S. at 571 n. 2, 94 S.Ct. 786) and by the Fifth Circuit in *Bossier Parish School Board, supra*, 370 F.2d at 852, is likewise mentioned there (41 F.R. 29552, July 16, 1976).

recipients of Federal financial assistance, attempts to bring non-complying recipients into voluntary compliance through informal efforts such as negotiation, and the imposition of sanctions against recipients who continue to discriminate against otherwise qualified handicapped persons on the basis of handicap. Such sanctions would include, where appropriate, the termination of Federal financial assistance to the recipient or other means otherwise authorized by law. Implementation of section 504 would also include pre-grant analysis of recipients to ensure that Federal funds are not initially provided to those who discriminate against handicapped individuals. Such analysis would include pre-grant review procedures and a requirement for assurances of compliance with section 504. This approach to implementation of section 504, which closely follows the models of the above-cited anti-discrimination provisions, would ensure administrative due process (right to hearing, right to review), provide for administrative consistency within the Federal government as well as relative ease of implementation, and *permit a judicial remedy through a private action.*" *Id.* at pp. 6390–6391. (Emphasis supplied.)

While the above language contemplates judicial review of an administrative proceeding as contradistinct from an independent cause of action in federal court, still it is plain that the rights of the handicapped were meant to be enforced at some point through the vehicle of a private cause of action. When administrative remedial machinery does not exist to vindicate an affirmative right, there can be no objection to

an independent cause of action in the federal courts.[29] See *Steele v. Louisville & N. R. Co.*, 323 U.S. 192, 206–207, 65 S.Ct. 226, 89 L.Ed. 173. In any event, under the second prong of the *Cort* test, there is surely an indication of legislative intent to create such a remedy and none to deny it.

■ (3) It is certainly consistent with the underlying purposes of the legislative scheme to imply such a remedy. Indeed, one of the explicitly detailed purposes of the Rehabilitation Act of 1973 was to "enforce statutory and regulatory standards and requirements regarding barrier-free construction of public facilities and study and develop solutions to existing architectural and transportation barriers impeding handicapped individuals." 29 U.S.C. § 701(11). Moreover, since a private cause of action in this case serves to enforce the uniform substantive standards laid down by the UMTA and HEW regulations, the unseemly vista of a spotty application of *ad hoc* remedies in lawsuits in various regions of the country is not presented here. And no objection to local implementation of these substantive standards can prevail since the nationwide Urban Mass Transportation Administrator's regulations which set out standards for meeting the needs of the handicapped in transportation only serve as a guide for the local implementation of transportation opportunities for the mobility-disabled. 41 F.R. 18234 (April 30, 1976).

(4) Affording a private remedy under Section 504 of the Rehabilitation Act of 1973 would not be the kind of suit traditionally relegated to state law in an area basically the concern of the States. In fact, both the RTA and CTA conceded below that it was the intent of Congress to deal

**29.** We expressly leave open as premature the question whether, after consolidated procedural enforcement regulations are issued to implement Section 504, the judicial remedy available must be limited to post-administrative remedy judicial review. In any event, the private cause of action we imply today must continue at least in the form of judicial review of administrative action. And until effective enforcement regulations are promulgated, Section 504 in its present incarnation as an independent cause of action should not be subjugated to the doctrine

of exhaustion. Cf. *Hardy v. Leonard*, 377 F.Supp. 831 (N.D.Cal.1974); *Southern Christian Leadership Conference, Inc. v. Connolly*, 331 F.Supp. 940 (E.D.Mich.1971). See also Albert, Standing to Challenge Administrative Action: An Inadequate Surrogate for Claims for Relief, 83 Yale L.J. 425, 451–456 (1974). But assuming a meaningful administrative enforcement mechanism, the private cause of action under Section 504 should be limited to a *posteriori* judicial review.

with the transportation needs of the handicapped on a national basis.

Because all four *Cort* tests are satisfied, we are reinforced in our holding that Section 504 implicitly provides a private remedy. Therefore, we need not and do not consider whether the Equal Protection Clause (together with 28 U.S.C. § 1343) and the other statutes cited in the complaint also confer jurisdiction on the district court.

Defendants rely principally on *Cannon v. University of Chicago* (7th Cir. Nos. 76–1238 and 1239, decided August 27, 1976), in arguing that Section 504 does not provide for a private right of action. There a panel of this Court held that Title IX of the Education Amendments of 1972 (20 U.S.C. § 1681) does not permit a private cause of action. However, the Court noted that in contradistinction to *Lau, Cannon* involved only an individual plaintiff who had not exhausted her administrative remedies (slip op. 11–16). Here we have a huge class, and plaintiffs and amicus Urban Mass Transportation Administrator have not persuaded us that any administrative remedy is yet available to plaintiffs and their class, nor has Congress provided other means of enforcement. Furthermore, it should be noted that the *Cannon* opinion is not final, for the panel granted the petition for rehearing in part on November 30, 1976, and now again has the case *sub judice.* There HEW's most recent brief quotes legislative history of Section 504 to show that a private right of action should be inferred (Br. 15–16).

■ Defendants and the amicus Urban Mass Transportation Administrator also rely on *Bradford School Bus Transit, Inc. v. Chicago Transit Authority,* 537 F.2d 943, 948 (7th Cir. 1976), in claiming that here plaintiffs must exhaust their administrative remedies before seeking judicial relief. There we applied the primary jurisdiction doctrine because the regulations specifically provided "for judicial review of administrative actions regarding school bus operations after certain procedures have been exhausted." No comparable regulations presently exist with respect to the problem at hand. There being no administrative remedy open to these plaintiffs, neither the exhaustion nor primary jurisdiction doctrine applies. *Rosado v. Wyman,* 397 U.S. 397, 405–406, 90 S.Ct. 1207, 25 L.Ed.2d 442.

Upon remand, defendants may of course be able to show that they are in compliance with the statutes on which plaintiffs rely and the regulations thereunder.[30] The affidavit filed in the district court by defendant CTA's general operations manager tends in that direction although it may already be partly obsolete in view of the Transbus developments (41 F.R. 15735, 32286–32287, 45842 (April 14, 1976; August 2, 1976; October 18, 1976)). See also notes 17–18 and accompanying text *supra.* Our opinion expresses no view on the ultimate merits of plaintiffs' case because the undeveloped record does not show whether RTA and CTA are following the statutes and regulations.[31]

In concluding, we cannot fault the district court for its dismissal order. Without the benefit of any regulations, it is difficult to perceive what relief could have been afforded at that stage. However, the Urban Mass Transportation Administrator's regulations were issued before this appeal was briefed and argued and of course apply to our deliberations. *Thorpe v. Housing Authority,* 393 U.S. 268, 281–282, 89 S.Ct. 518, 21 L.Ed.2d 474; *United States v. Fitzgerald,* 545 F.2d 578, 581 (7th Cir. 1976). Since the plaintiffs may now be able to

30. Since the Urban Mass Transportation Administrator's regulations became effective on May 31, 1976, plaintiffs now challenge only projects whose funding was approved after that date. On remand, leave should be granted to plaintiffs to make post-May 31 allegations. Cf. note 5 *supra.*

31. In *Lau,* the opinion of the Court adverted to a contract between HEW and the San Francisco Unified School District compelling it to comply with Title VI of the Civil Rights Act of 1964 and HEW's regulations thereunder and to take any necessary measures to effectuate the contract (414 U.S. at 568–569, 94 S.Ct. 786). Through discovery on remand, plaintiffs will be able to ascertain whether any agreements between defendants and federal agencies contain equivalent terms.

show that they are entitled to remedial action, the case must be returned to the district court for appropriate further proceedings. If effective by then, consideration will also have to be given to HEW's proposed regulations (note 19 *supra*).

Vacated and remanded.[32]

---

**32.** On remand, leave should be granted to amend the complaint to add the HEW Secretary, the Secretary of Transportation and the Urban Mass Transportation Administrator as defendants and Section 165 of the Federal-Aid Highway Act of 1973, as amended (88 Stat. 2283) as one of the statutes relied upon, as prayed in plaintiffs' briefs (Br. 12 and Reply Br.

6)   Such amendments will not unfairly surprise the litigants, for the CTA below and the district court discussed the federal official point, as did the amicus Urban Mass Transportation Administrator, and the Federal-Aid Highway Act was first discussed in RTA's briefs below and again in the district court's opinion.