ATLANTIS COMMUNITY, INC., Gray Panthers of Denver, Mountain Plains Congress of Senior Organizations, Glenn Kopp, Marilyn Weaver, Bob Conrad, Mel Conrardy, and Carolyn Finnell, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

Brock ADAMS in his official capacity as Secretary of the United States Department of Transportation, Robert F. Page, in his official capacity as Administrator of the Urban Mass Transportation Administration, Regional Transportation District, Regional Transportation District Board of Directors, John D. Simpson, in his official capacity as Executive Director and General Manager of the Regional Transportation District, Defendants.

Civ. A. No. 77 M 707.

United States District Court, D. Colorado.

June 30, 1978.

John R. Holland and Maurice Knaizer, Commerce City, Colo., Kent B. Connally, Dudley P. Spiller, Jr., Denver, Colo., for plaintiffs.

C. Scott Crabtree, Asst. U. S. Atty., Denver, Colo., and Robert W. Batchelder, Urban Mass Transportation Administration, Washington, D. C., for federal defendants.

Howard J. Beck and Gregory D. Jones, John S. Pfeiffer, Robert J. Kapelke and Wiley Y. Daniel, Gorsuch, Kirgis, Campbell, Walker & Grover, Denver, Colo., for Regional Transportation District.

## MEMORANDUM OPINION AND ORDER

MATSCH, District Judge.

This is a class action brought on behalf of all persons within the service area of the defendant Regional Transportation District (RTD) who have mobility handicaps which deny them the ability to use the mainline transit services provided by that defendant. Initially the plaintiffs moved to enjoin delivery and use of 213 new buses being acquired by RTD with federal financial assistance granted by the Urban Mass Transportation Administration (UMTA). The motion for preliminary injunction was denied by a memorandum and order entered on November 9, 1977. AM General and Rohr-Flexible, both of whom are bus manufacturers, were then dismissed. The remaining parties entered into a stipulation requesting this court to enter a partial summary judgment declaring the plaintiffs' rights and defendants' duties under the statutes and constitutional provisions which are the bases of the claims made.

The court has declined to exercise pendent jurisdiction over any claims based upon Colorado law, particularly C.R.S.1973, § 24–34–801.

Essentially the plaintiffs contend that the use of federal financial assistance to purchase buses which do not have hydraulic lifts and wheelchair securing devices available within present technology result in a denial of statutory entitlement to mainline public transit service and are unconstitutionally discriminatory.

The statutes involved are § 16 of the Urban Mass Transportation Act of 1964, as amended (UMT Act), 49 U.S.C. § 1612, and § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794. It is necessary to set forth these sections to consider the questions presented. Section 16 of the UMT Act provides:

(a) It is hereby declared to be the national policy that elderly and handicapped persons have the same right as other persons to utilize mass transportation facilities and services; that special efforts shall be made in the planning and design of mass transportation facilities and services so that the availability to elderly and handicapped persons of mass transportation which they can effectively utilize will be assured; and that all Federal programs offering assistance in the field of mass transportation (including the programs under this Act) should contain provisions implementing this policy.

(b) In addition to the grants and loans otherwise provided for under this Act, the Secretary is authorized to make grants and loans—

(1) to States and local public bodies and agencies thereof for the specific purpose of assisting them in providing mass transportation services which are planned, designed, and carried out so as to meet the special needs of elderly and handicapped persons, with such grants and loans being subject to all of the terms, conditions, requirements, and provisions applicable to grants and loans made under section 3(a) and being considered for the purposes of all other laws to have been made under such section; and

(2) to private nonprofit corporations and associations for the specific purpose of assisting them in providing transportation services meeting the special needs of elderly and handicapped persons for whom mass transportation services planned, designed, and carried out under paragraph (1) are unavailable, insufficient, or inappropriate, with such grants and loans being subject to such terms, conditions, requirements, and provisions (similar insofar as may be appropriate to those applicable to grants and loans under paragraph (1)), as the Secretary may determine to be necessary or appropriate for purposes of this paragraph.

Of the total amount of the obligations which the Secretary is authorized to incur on behalf of the United States under the first sentence of section 4(c), 2 per centum may be set aside and used exclusively to finance the programs and activities authorized by this subsection (including administrative costs).

(c) Of any amounts made available to finance research, development, and demonstration projects under section 6 after the date of the enactment of this section, 1½ per centum may be set aside and used exclusively to increase the information and technology which is available to provide improved transportation facilities and services planned and designed to meet the special needs of elderly and handicapped persons.

(d) For purposes of this Act, the term 'handicapped person' means any individual who, by reason of illness, injury, age, congenital malfunction, or other permanent or temporary incapacity or disability, is unable without special facilities or special planning or design to utilize mass transportation facilities and services as effectively as persons who are not so affected. 49 U.S.C. § 1612.

Section 504 of the Rehabilitation Act reads:

No otherwise qualified handicapped individual in the United States, as defined in section 706(6) of this title, shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity re-

ceiving Federal financial assistance. 29 U.S.C. § 794.

In the memorandum and order of November 9, 1977, it was observed that subsection 16(a) of the UMT Act, adopted in 1970, seems clear and unequivocal in its commitment to make mass transportation available for utilization by elderly and handicapped persons by making such special efforts in the planning and design of facilities and services that such persons may have the same right as other persons.

The defendants concede that accessibility for the mobility handicapped is a national goal but emphasize that the timing and techniques to achieve that goal effectively, safely, and reliably are matters which must be left to the Secretary of Transportation.

Subsections (b) and (c) authorize the Secretary to make grants and loans for state and local programs of affirmative action to assist in meeting the "special needs of elderly and handicapped persons" and, curiously, seem to place percentage limitations on the amounts which may be set aside and used exclusively to finance such programs and activities. The defendants emphasize these subsections in urging their position that the Congress did not require any instantaneous implementation of the stated national policy and did not impose any time limitation on administrative action to develop the necessary programs.

The plaintiffs admit that full accessibility cannot be achieved without the use of special devices to overcome their handicaps, and that time was needed for research and development of the necessary technology. What they urge is that the required equipment and operational techniques are now readily available and that the failure of the Secretary to require installation and use on the subject RTD buses is a violation of a legal duty imposed by § 16 of the UMT Act. At the hearing on the motion for preliminary injunction the plaintiffs presented some evidence concerning specific equipment which could be installed and they stand ready to provide further evidence about what is now available for use.

The Secretary has selected a different form of technology and made a policy decision on May 19, 1977 to limit the requirement of installation and operational use to new buses purchased by grants after September 30, 1979, with an interim policy of requiring special services for wheelchair users. That has come to be called the Transbus decision. While no court has specifically approved the Transbus decision, at least two Circuits of the United States Court of Appeals have approved an interpretation of Section 16 that the Department of Transportation has the delegated authority to develop interpretative regulations. *United Handicapped Federation v. Andre*, 558 F.2d 413 (8th Cir. 1977); and *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977).

Section 504 of the Rehabilitation Act established a general policy against discrimination in or exclusion from any program or activity receiving federal financial assistance solely by reason of a handicap. The President issued Executive Order 11914 to place responsibility for the implementation of that policy with the Secretary of Health, Education and Welfare. HEW did on January 13, 1978, publish guidelines regarding "Coordination of Federal Agency Enforcement of Section 504 of the Rehabilitation Act of 1973." That publication established procedures, standards, and guidelines to be followed by each federal agency providing federal financial assistance in issuing its regulations necessary to implement § 504, and, specifically said this of buses at § 85.58:

New Construction.

(a) Except as provided in paragraph (6) of this section, new facilities shall be designed and constructed to be readily accessible to and useable by handicapped persons.

\* \* \* \* \* \*

(b) The Department of Transportation may defer the effective date for requiring all new buses to be accessible if it concludes on the basis of its section 504 rulemaking process that it is not feasible to require compliance on the effective

date of its regulation: Provided, That comparable, accessible services are available to handicapped persons in the interim and that the date is not deferred later than October 1, 1979. 43 F.R. 2134, January 13, 1978.

Some explanation of the rationale for this guideline is provided in this language from the preamble:

A difficult problem that has arisen during the comment period with respect to § 85.58 is its effect upon buses ordered in the interval between the final issuance of individual agency 504 regulations and the effective date of the Department of Transportation's ruling concerning Transbus. (That ruling requires that all buses acquired with the assistance of the Urban Mass Transportation Administration (UMTA), ordered after September 30, 1979, meet the specifications for Transbus—a low-floor, ramped bus.) Because of the complexity of the bus accessibility issue, the final regulation has been amended to allow the Department of Transportation (DOT) to defer the effective date for requiring all new buses to be accessible if DOT concludes during its section 504 rulemaking process that it is not possible to do so by the effective date of its own section 504 regulation and if comparable, accessible services are available to handicapped persons in the meantime. The date may not, however, be deferred beyond the present effective date of the Transbus decision—October 1, 1979. Because this Department agrees that Transbus is the most effective means of providing handicapped persons with accessible bus transportation, it encourages the Department of Transportation to take all possible steps to expedite the purchase of Transbus by its recipients. 43 F.R. 2136, January 13, 1978.

With respect to the issue of discrimination, HEW said in another portion of the preamble:

[T]he Department wishes to make clear that it does not construe this section, nor §§ 85.56–58, to preclude in all circumstances the provision of specialized services as a substitute for, or supplement to, totally accessible services, nor do these sections require door-to-door transportation service. 43 F.R. 2134, January 13, 1978.

Section 165(b) of the Federal-Aid Highway Act of 1973, as amended, 23 U.S.C. § 142, is another direction to the Secretary of Transportation to require that projects receiving federal financial assistance shall be planned, designed, constructed, and operated to allow effective utilization by elderly or handicapped persons.

The plaintiffs rely upon such cases as *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*, 146 U.S.App.D.C. 33, 449 F.2d 1109 (1971); *Brown v. Lynn*, 385 F.Supp. 986 (N.D.Ill.1974); and *Sierra Club v. Ruckelshaus*, 344 F.Supp. 253 (D.D.C.1972), *aff'd per curiam sub nom. Fri v. Sierra Club*, 412 U.S. 541, 93 S.Ct. 2770, 37 L.Ed.2d 140 (1973), to claim that it is proper for this court to rule that the interpretative regulations of DOT and HEW are contrary to the congressional mandate for full accessibility to mainline transit service and to order the implementation of existing hydraulic technology. It is the existence of that technology which they say distinguishes the present case from those which have been decided earlier.

The plaintiffs have made a compelling case for their needs for affirmative action to end their isolation and to give an opportunity to enter into the mainstream of community life. Those handicapped persons who testified at the preliminary injunction hearing were eloquent in their observations of the effects of physical disabilities which deny them mobility in a very mobile society. They are denied opportunities for employment, education, cultural enrichment and a sharing of the society of others. Isolation has deprived them of identity and the physically handicapped have long been invisible to the majoritarian forces of self governance.

That is now changing and it is to the credit of Congress that in its efforts to promote the general welfare, it has seen fit

to recognize that there are special needs to be considered. The statutory provisions under consideration here are compassionate. The plaintiffs, however, do not want compassion or sympathy, they want access to transportation. That cannot be achieved by the announcement of goals or by the pretense that the passage of platitudes serves the purpose of prescribing public policy.

Providing public transportation for the mobility disabled is an extraordinarily difficult undertaking. It requires more than an analysis of available technology to determine what is reasonably safe, reliable and effective. It also involves the identification of those to be served and their differing needs. The record in this case shows that much more is involved than wheelchair accessibility. The statutory definition of disabled in § 1612(b) includes more than those who are confined to wheelchairs. Indeed, the evidence at the hearing on the preliminary injunction shows that there are differing configurations of wheelchairs which significantly affect the use of hydraulic lifts. There are also questions of priorities in making public expenditures and conflicting needs.

There was once a clear definition of the divisions of function and authority in our tripartite system of government which would place responsibility for confronting such hard choices of policy to design a purposeful program with the legislative branch. The Congress is most representative of and directly accountable to the people. It was then thought to be the function of the executive branch to translate such a program into action. It too is a political branch accountable to the electorate. The complexity of modern society and the enormous growth of the governmental role has changed this simplistic structure. It is becoming increasingly characteristic of the Congress to avoid participation in the process of collecting information, considering conflicting interests, and accepting responsibility for controversial decisions not likely to be received with universal acclaim. Instead, the recurring practice is to make broad delegations of authority to executive departments which must then accept the burden of addressing the problems through the rule making process.

When, as here, that process fails to meet the expectancies created by the Congressional language, those whose needs and wants are frustrated come to the courts for relief. Whether the approach is one of judicial review of the administrative action, or mandamus to compel action, or invocation of the authority to interpret federal law, the result is to place the courts in a decidedly unfamiliar role for which they are inappropriately designed. The Supreme Court of the United States has had occasion to remind us of the respective roles of the branches of national government as recently as the decision in *Tennessee Valley Authority v. Hill*, —— U.S. ——, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978) in these words:

But these principles take a court only so far. Our system of government is, after all, a tripartite one, with each Branch having certain defined functions delegated to it by the Constitution. While "[it] is emphatically the province and duty of the judicial department to say what is law," *Marbury v. Madison*, 5 U.S. 137, 177, 2 L.Ed. 60 (1803), it is equally—and emphatically—the exclusive province of the Congress not only to formulate legislative policies, mandate programs and projects, but also to establish their relative priority for the Nation. Once Congress, exercising its delegated powers, has decided the order of priorities in a given area, it is for the Executive to administer the laws and for the courts to enforce them when enforcement is sought.

Here we are urged to view the Endangered Species Act "reasonably," and hence shape a remedy "that accords with some modicum of common sense and the public weal." *Post*, at —— [98 S.Ct. at 2302. But is that our function? We have no expert knowledge on the subject of endangered species, much less do we have a mandate from the people to strike a balance of equities on the side of the Tellico Dam. Congress has spoken in the plainest of words, making it abundantly

clear that the balance has been struck in favor of affording endangered species the highest of priorities, thereby adopting a policy which it described as "institutionalized caution."

Our individual appraisal of the wisdom or unwisdom of a particular course consciously selected by the Congress is to be put aside in the process of interpreting a statute. Once the meaning of an enactment is discerned and its constitutionality determined, the judicial process comes to an end. We do not sit as a committee of review, nor are we vested with the power of veto . . .

*Id.* at ——, 98 S.Ct. at 2301. There the Court found that § 7 of the Endangered Species Act plainly prohibited completion of the Tellico Dam because of its impact on the only known habitat for a subspecies of fish and ruled that it was not the function of the judiciary to provide any refuge for reasonableness in such policy determinations.

■ While there are superficial similarities between § 7 of the Endangered Species Act and the statutes which are involved here, they are substantively different. What separates them is the difference between the words "do" and "don't." In the Endangered Species Act, Congress said don't do anything to destroy endangered species. In these statutes, Congress said do something for the mobility handicapped and left it to the Secretary to determine what that something should be. The enforcement of a prohibition of conduct is the traditional purpose of the injunctive remedy. The prescription of particular conduct among a wide range of possibilities is not an appropriate judicial function either through mandamus or a mandatory injunctive remedy.

How plain is the language of § 16(a) of the UMT Act and § 504 of the Rehabilitation Act? What must be done to provide handicapped persons with the same right to utilize mass transportation facilities as other persons? Does each bus have to have special capacity? Must each seat on each bus be removable? Must the bus routes be changed to provide stops at all hospitals, therapy centers and nursing homes? Is it required that buses be able to accommodate bedridden persons? Is it discriminatory to answer any of these questions in the negative? Will the operation of hydraulic lifts on buses involve stigmatizing effects on the persons who use them? If so, is that a discrimination solely by reason of handicap within the meaning of § 504?

These few questions illustrate the enormous difficulties which would be encountered by any attempt to establish the required affirmative program through the judicial process. Those difficulties would be compounded by the fact that these are national laws and national programs. Conflicting or even different interpretations in different courts within the federal judicial structure would result in a paralysis in the DOT and HEW until the matter finally reached the Supreme Court. The delay attendant upon that process may not only disadvantage the handicapped, it could halt or hinder the country's entire mass transportation system.

A far more appropriate and effective method for achieving the proclaimed objective of providing transportation opportunities for the handicapped would be for the Congress to maintain an oversight of administrative action and to provide such direction as may be needed.

■ What is now decided here is that the federal statutes under which the plaintiffs claim do not provide a sufficient definition of the duties of the federal defendants to enable this court to give direction to them.

■ The plaintiffs also contend that the use of federal funds to provide public transportation in a manner which excludes them is a violation of their constitutional rights. A traditional equal protection analysis is made most difficult by the fact that there is no clearly identifiable classification. Who is mobility handicapped? The definition in § 1612(b) is so broad as to be unworkable. People would move in and out of the class because of temporary conditions and what might be disabling to one person may be

only an inconvenience to another. It could not be questioned that the use of the power of government to prohibit participation in public benefits might well be invalid in the absence of demonstrated compelling governmental necessity. Thus, to proclaim that persons on crutches or with canes may not board a bus might work an infringement on the individual's right in the absence of public necessity. That, however, is far different from determining that the Constitution requires that public transportation be conducted through facilities which can service everyone regardless of need.

■ It is apparent that we are on the frontier of a new era of concern for the civil rights of all persons. In its perceptions of personhood the law must not accept any diminution or dilution from individual dignity or worth because parts of a person are missing, disfunctioning or nonfunctional.

It is instructive, however, to reflect upon our recent history in efforts to eliminate the effects of racial discrimination in making equal the educational opportunities provided by government. From *Brown v. Board of Education*, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) forward, the federal courts have required the integration of classrooms to correct the effects of segregationist policies or practices. Such integration is a remedy for past practices which were prohibitory in nature. Black children were prevented from attending white schools by governmental action.

The only governmental activity which can be considered to have excluded the plaintiffs here is a failure to design, build and operate buses with facilities which they can use. Are questions of constitutional rights to be measured according to changing technology? I think not. Insofar as this case turns upon whether the present inability to use the bus facilities provided by the defendant RTD is itself a denial of some constitutionally protected right, the claim must fail.

■ There is no merit to the plaintiffs' claim that the failure to provide access to RTD buses is an infringement of their personal liberty to travel. *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969) and *Memorial Hospital v. Maricopa County*, 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974), are cases in which the Supreme Court recognized that the nature of the Federal Union required that all citizens be free to travel throughout the country, uninhibited by unreasonably burdensome statutes, rules and regulations. That necessity and consequent constitutional protection is not applicable for intrastate travel. *Wardwell v. Board of Education of City School Dist. of City of Cincinnati*, 529 F.2d 625 (6th Cir. 1976). Moreover, a right to be free from unreasonable restriction of travel is different from the asserted right to be able to travel by public transportation where the lack of access is a physical inability to board buses.

This memorandum opinion and order shall constitute a partial summary judgment for the defendants on the issues discussed. It may or may not be dispositive of the case. Because the interpretation of the statutes and Constitution given here are different from the contentions of the plaintiffs, they should now have the opportunity for further pleading such additional matters and claims as they wish to assert. An appropriate pleading would be a supplemental complaint.

Two courts have recognized an implied private cause of action under Section 504 of the Rehabilitation Act to determine whether local transportation systems are acting according to applicable federal regulations. *Leary v. Crapsey*, 566 F.2d 863 (2d Cir. 1977); and *Lloyd v. Regional Transportation Authority*, 548 F.2d 1277 (7th Cir. 1977). Both cases were remanded to the district courts for further proceedings but with no guidelines for the courts to follow. I have not addressed the question of compliance by RTD with either DOT or HEW regulations in this partial summary judgment ruling.

Alternatively, the plaintiffs may wish this court to enter a final judgment of dismissal or a Rule 54(b) determination to enable an appeal of this ruling.

Upon the foregoing, it is

ORDERED that the views expressed herein shall constitute a declaratory judgment but that the Clerk shall defer the entry of any judgment for a period of thirty (30) days to permit the plaintiffs to present further pleadings.