OPINION OF THE COURT
Ernst H. Rosenberger, J.
Plaintiffs move, pursuant to CPLR 2217 et seq., 6301 and 6312, for an order granting a preliminary injunction to enjoin defendants from taking action in violation of the Public Buildings Law and of an order of Mr. Justice Nadel, dated May 1, 1981.
Individual defendants Regan and Goldin take no position on the motion, stating in their respective affidavit and affirmation that plaintiffs do not seek to enjoin them.
*344 Plaintiff Eastern Paralyzed Veterans Association is a not-for-profit corporation, with a membership of approximately 1,500 spinal cord injured veterans of the Armed Forces of the United States who are paraplegics or quadraplegics. Plaintiff Peters, a paraplegic, is the executive director of that association. Peters and members of the association reside and/or work in the New York City area and seek to use the transportation system of the city.
In this action against the defendant authorities and their respective boards, plaintiffs seek injunctive and declaratory relief under subdivision 1 of section 123-b of the State Finance Law. The complaint alleges violation of sections 51 and 52 of the Public Buildings Law. That portion of the complaint alleging discriminatory practices, in violation of subdivision 9 of section 292 and section 296 (subd 2, par [a]) of the Executive Law, has been dismissed. (Eastern Paralyzed Veterans Assn. v Metropolitan Transp. Auth., 79 AD2d 516.)
A prior motion by defendants, for summary judgment for failure to state a cause of action, was denied by Mr. Justice Nadel, in a memorandum decision dated April 13,1981. In that decision, the three-year Statute of Limitations period of CPLR 214 (subd 2) was determined to be applicable. It is the order dated May 1, 1981, entered upon that decision, which plaintiffs cite as partial basis (in “contempt” language) for this motion for a preliminary injunction. The parties have acknowledged that that order is the law of the case.
After oral argument on this motion, on October 1, 1982, it was agreed between counsel that a temporary restraining order should be continued pending a determination on this motion; that construction bids may be advertised on November 29, 1982; that no contract will be awarded this year; and that defendants will not use the bids or the advertisements as an argument in the lawsuit or as a change of posture in any way.
It is plaintiffs’ position that the authorities recently have eliminated elevators from the plans for station modernization which will deny access to rail systems of transportation, thereby violating the Public Buildings Law, the State *345 Building Construction Code and the court order of May 1, 1981.
The station modernization program at issue includes a five-year capital program, which, together with some city funding, will improve 57 of 465 stations in New York City. At 10 stations, those at issue in the matter, structural alterations to the existing points of access are planned to improve circulation. The stations which would require elevators as part of the circulation improvements, according to plaintiffs and internal memoranda of defendants, are: IND 42nd Street/Eighth Avenue; IRT Grand Central Station; IRT 74th Street and Broadway; IND Roosevelt Avenue; Herald Square; IRT Pelham Bay Park Station; IRT Main Street; IRT 149th Street and Third Avenue; IRT Pelham Parkway. Of these 10, 2 will be constructed with elevators and ramps as originally planned.
Plaintiffs contend that for a full year the planned elevators were conceded to be required by statute. Elimination of the elevators from the plans, according to plaintiffs, is an attempt to circumvent, not only the statute but also the court order ruling that the authorities are subject to those statutes.
Sections 51 and 52 of the Public Buildings Law state:
“In addition to any other requirements respecting the construction of a public building and facilities thereof, the new construction, reconstruction, rehabilitation, alteration or improvement of all such buildings and facilities shall conform to the requirements of the state building construction code relating to facilities for the physically handicapped, except work already completed, work in progress, or work for which schematic designs have been approved by the effective date of this act. This section shall not be effective if its provisions will impair the structural stability of the public building or its facilities.” (Public Buildings Law, § 51.)
“The official, governing body or board having design approval authority for state or municipal building construction shall determine whether a proposed structure is a ‘public building’ within the meaning of this article and shall ensure that the design of any such building complies *346 with the requirements hereby imposed.” (Public Buildings Law, § 52.)
These sections were added in 1972, and amended in 1974, as article 4-A of the Public Buildings Law, providing for access and use of public buildings by the physically handicapped.
The State Building Construction Code (hereinafter SBCC), referred to in section 51 of the Public Buildings Law, has only one section pertaining to facilities for the physically handicapped (9 NYCRR Part 824). From the text alone of the SBCC, it is not immediately clear that the stations are of a class required to be equipped with such facilities. However, subdivision 1 of section 50 of the Public Buildings Law specified “transportation terminals and stations” as among those structures included in the definition of “public building.” Then, section 51 specifies that “the new construction, reconstruction, rehabilitation, alteration or improvement” of such buildings and facilities shall conform to the SBCC relating to facilities for the physically handicapped. Therefore, the stations are in the category which must have at least one path of travel providing access, and must meet certain requirements pertaining to doors, toilets, drinking fountains and telephones, as detailed in the SBCC. (Other than the earlier reported decisions in this action, there are no reported cases applying the Public Buildings Law or the SBCC through the Public Buildings Law.)
After ruling that sections 50 and 51 of the Public Buildings Law apply to the authorities, Mr. Justice Nadel stated at pages 4-5 of his decision: “The requirements imposed upon defendants by sections 51 and 52 of the PEL are sufficiently clear to make any violation thereof enforceable, and the pleaded allegations of such a violation are fully ‘justiciable’. Article 4-A of the PEL provides that defendants must conform Section 51 work to that portion of the SBCC relating to facilities for the physically handicapped (as fully set forth in 9 NYCRR § 824).. Section 50(6) defines ‘reconstruction, rehabilitation, alteration or improvement’ as ‘only that work which results in a substantial change in the structure or facilities of a public building and shall not include minor repairs necessary for ordinary *347 maintenance.’ To establish whether conformity with the SBCC is required with respect to any particular work being performed, defendants need only determine whether such work is to be performed on a ‘public building’ as defined in PBL section 50(1) and whether the work constitutes section 51 work or ‘minor repairs’ as defined by PBL section 50(6). The necessity for such an exercise of reasonable discretion and judgment on the part of defendants is hardly a novel incident of administrative authority. It neither makes Article 4-A unenforceably vague, nor involves the court in anything more than its traditional role of judicial review of determinations made pursuant to duly delegated administrative authority.”
In a memorandum dated August 17,1982, counsel to the Metropolitan Transportation Authority (MTA) questioned whether the planned modernization with respect to elevators, was not section 51 work, but rather in the category of repairs (Public Buildings Law, § 50, subd 6). Earlier, on November 13, 1981, the MTA board had authorized the station modernization design to proceed, with a specific direction that the matter of elevator installation be referred back to the board before construction contracts were let for the 10 locations involved. The board, on August 19, 1982, made what it contends here was a reasonable determination, i.e., that the access modernization for the 10 stations was not “substantial renovation” and that the 10 stations even if made accessible were not likely to be used by wheelchair-bound.
The portion of the Public Buildings Law, providing for access and use by the physically handicapped, was amended in 1974, to broaden its applicability, from new construction, to include alteration. The legislative memorandum (McKinney’s Session Laws of NY, 1974, at pp 2003-2004) explained:
“Subdivision 4 of Section 374-a of the Executive Law and Section 51 of the Public Buildings Law stipulate that the design and construction of public buildings (defined in subdivision one, Section 50 of the Public Buildings Law) in the State are subject to the provisions in the State Building Code for making buildings accessible to and usable by the physically handicapped regardless of whether or not a *348 municipality in which a building is built has adopted the State Building Code. The law, however, is presently restricted to newly designed buildings. This proposed legislation would extend the scope of the existing law to include remodeling, reconstruction, rehabilitation, alteration and improvement of existing buildings.
“Most public buildings in the State were constructed prior to September 1, 1972, the effective date of the existing act. Thus, the impact of existing legislation cannot be very significant for a long time to come. Handicapped people are still unable to enter or use those buildings that had architectural barriers before the law was passed. This means that they are still denied education, recreation, employment and other opportunities to which they have the right given their status as citizens of New York State.
“Public buildings are always undergoing change. Many architectural barriers in existing buildings, could be eliminated simply by requiring such changes to meet the same regulations as new construction, wherever the changes would not hamper the structural safety of the building. This would eliminate a great oversight in the existing law.
“The Federal government, in Public Law 90-480, 90th Congress, S. 222, has recognized this problem in requiring alterations of public buildings built with Federal funds to meet the same standards as new construction. Some states, for example, Illinois and Michigan, have also included alterations, remodeling, etc. in the scope of their ‘barrier-free design’ legislation. The State of New York should follow suit.
“This bill would cost the State but a nominal sum. It has been estimated that removing architectural barriers increases total costs less than 1% for new construction. Walter Meisen, Assistant Commissioner, Office of Construction Management, Public Buildings Service, U.S. General Services Administration, has stated that such features that are necessary are ‘a negligible factor in the cost of new construction, and improve accessibility and usability of the facility not only to the handicapped individual, but also to individuals without handicaps.’ The benefits to be derived are great. It was estimated, by the *349 National Health Survey of 1969, that more than 1 out of every 10 people in the U.S. had some degree of activity limitation due to chronic disease or disability. The. elderly population has a particularly high incidence of disability. In fact, due to the high likelihood of disability with increased age, the 10.8% of this State’s population which is over 65 years of age should all be considered as potential beneficiaries of this Act.”
By the 1974 amendment, the scope of the statute was extended to include reconstruction, rehabilitation, alteration or improvement (Public Buildings Law, § 51) but not work already completed or in progress or for which designs had been approved by May 23, 1974, and not to the extent that the structural stability of the public building or its facilities would be impaired. The terms “[Reconstruction, rehabilitation, alteration or improvement” are defined as a group, to mean “work which results in a substantial change in the structure or facilities” but not “minor repairs necessary for ordinary maintenance.” (Public Buildings Law, § 50, subd 6.) Defendants argue neither on the basis of the degree of the completion of work or design plans, nor by indicating that structural stability is impaired. Rather, their position is based entirely on their classification of the modernization planned as reasonably within the repair category. Unfortunately, the terms utilized by the Legislature in the 1974 amendment are defined in no greater detail than the group definition in subdivision 6 of section 50.
The SBCC defines “alteration” as “[a]ny change, rearrangement, or addition to a building other than repairs; any modification in construction, or in building equipment.” (9 NYCRR 803.3 [a] [5].) “Repair” is defined as “[Replacement or renewal, excluding additions, of any part of a building, structure, device, or equipment, with like or similar materials or parts, for the purpose of maintenance”. (9 NYCRR 803.3 [a] [98].) No definitions appear in the SBCC for reconstruction, rehabilitation, improvement, change or substantial change. (See 9 NYCRR 803.3.)
The Federal Architectural Barriers Act (US Code, tit 42, § 4151 et seq.) and the Architectural and Transportation Barriers Compliance Board statute (US Code, tit 29, § 792) *350 have resulted in Federal standards and a Federal regulatory scheme with more detailed definitions. (36 CFR 1190.3.) Because the Architectural Barriers Act is cited in the legislative memorandum for the 1974 amendment, as an example for New York to follow, the Federal definitions are particularly relevant. “Alteration” is defined as including, but not limited to, “remodeling, renovation, rehabilitation, reconstruction, changes or rearrangement in structural parts, and extraordinary repairs. It does not include normal maintenance, reroofing, interior decoration, or changes to mechanical systems.” (36 CFR 1190.3.) “‘Extraordinary repair’ means the replacement or renewal of any element of an existing building or facility for purposes other than normal maintenance.” (36 CFR 1190.3.) Normal maintenance, repair, and improvement are not defined. There is, however, a definition for “[s’ltructural impracticability” which includes “having little likelihood of being accomplished without * * * [incurring] an increased cost of 50 percent or more of the value of the element of the building or facility involved.” (36 CFR 1190.3.) The term “element” has a detailed meaning with examples given, including a telephone, a curb ramp, and a door. (In the Federal scheme, a door is an “element” of an entrance, which is a “space” in an “essential feature” of a building.) Alterations of existing buildings must comply with the standards of access for the physically handicapped (36 CFR 1190.31), if existing elements, spaces and essential features, or common areas are altered; or if an escalator or new stairs requiring major structural changes is planned where none existed previously; or if alterations of single elements when considered together amount to alteration of a space. (36 CFR 1190.33 [a].) Where substantial alteration occurs, then each element or space altered must comply with the accessibility standards, except if structurally impracticable. Other exceptions relate to the cost of compliance, in proportion to the cost of the other alteration; to alterations solely to electrical, mechanical or plumbing systems, and to spaces not frequented by the public or by employees of the facility.
Against the background of the Federal scheme, the utilization in New York’s Public Buildings Law of the word *351 “minor” repairs appears significant in the 1974 amendment (Public Buildings Law, § 50, subd 6). Together with the legislative memorandum which indicates an intent to speed up access for the physically handicapped, the station modernization as described by the defendants appears to be the very type of substantial change which the Legislature intended. That the monetary cost, to the State, was thought by the Legislature to be “nominal,” and estimated recently by the MTA board to be more than nine million dollars, is a severe factual dispute. (The various memoranda, obtained pursuant to discovery and Freedom of Information Act requests, have been considered but deemed neither dispositive, nor binding as to any positions taken, nor “admissions” of their content. Also, the contention by plaintiffs here, that defendants failed in attempts to alter the legislative mandate this year and, thereafter, abruptly eliminated the elevators; or as defendants respond, that the legislative efforts by defendants were unrelated to the cost of elevators in the modernization program has not been considered on this motion.) The suggestions that the MTA might apply for a station-by-station variance from the code (Executive Law, §§376, 382) or for amendment of the code (Executive Law, §§ 374, 377) seem appropriate.
In arriving at the determination to eliminate elevators from the modernization plans for the 10 stations, the board referred to the cost threshold section of the SBCC and of the Federal regulations with respect to access by the physically handicapped. In substance, these sections exempt work from compliance with the requirements for access by tke physically handicapped, where the cost of the modernization of each of the 10 stations is small, in proportion to the monetary value of the respective station. New York’s State Building Code, for example, provides that the code is, in general, applicable to existing buildings “altered or repaired, when the cost of such alterations or repairs within any six-month period exceeds 50 percent of the cost of replacement of the building at the beginning of that six-month period.” (9 NYCRR 801.2 [a] [3].) The MTA board states that “It is uncontested that none of the station alterations for the eight stations in question here come *352 close in cost to fifty percent of the replacement value of the stations involved.” The defendants find support, also, in the Federal regulations, for this cost analysis exemption from the requirements of installing facilities for the physically handicapped. The minimum guidelines and requirements for accessible design, propounded by the Architectural and Transportation Barriers Compliance Board, effective September 3, 1982, include a cost exemption for alterations to existing buildings or facilities. (36 CFR 1190.33 [c] [in 47 Fed Reg (Aug. 4, 1982), p 33869].) The regulations, with respect to existing buildings undergoing “substantial” alteration (which requires compliance with installation requirements), concludes that “an alteration to any building or facility is to be considered substantial if the total cost for [any] twelve month period amounts to 50% or more of the full and fair cash value of the building”. (36 CFR 1190.33 [c].) The board therefore argues that, in the absence of a more specific legislative definition of what work requires compliance with Part 824 of the SBCC, it is reasonable to utilize these 50% cost exemption sections, and to so limit expenditures as the board determined on August 19, 1982.
Those “50%” provisions, in the SBCC and in the Federal regulations, are not worded as conclusive definitions. Those provisions do constitute a rule requiring that any alteration which amounts to 50% of the cash value of the building must be viewed as a substantial alteration. The provisions do not define “substantial” as beginning only when the 50% cost threshold is reached. Therefore, compliance is required for alterations greater than 50% in value, but not exclusively those, by the plain meaning of the words. Applying the “50% test” as the MTA did here, would leave very little alteration outside of the “minor” repair category. It cannot be said that such a conclusion is correct or reasonable.
While both the SBCC and the Federal regulations recognize “the deterrent effect of costly requirements for elevator installations intended for the relatively small wheelchair-bound population,” as defendants describe it, the New York Legislature did not so limit its mandate in the Public Buildings Law to provide for access for the handi *353 capped to stations and transportation terminals. The limitation by the Legislature was only as to “minor” repairs necessary for ordinary maintenance, work in progress, or where structural stability will be impaired. For an entity “having design approval authority” (Public Buildings Law, § 52) to base decisions regarding compliance upon a cost analysis, or a definition, or statistics, which result in virtually automatic exemption from the conformance to the SBCC for facilities for the physically handicapped, violates the statute.
The argument by the defendants, that because the definition of a “public building” is one “likely to be used” and their statistics reveal that the stations are not likely to be used by the wheelchair-bound, must fail also. Until properly equipped, the stations are not only “not likely to be used,” they cannot be used. The statistics from the METRO (Washington), MARTA (Atlanta), and BART (San Francisco) systems, as comparisons, are not dispositive to New York, so that a determination cannot be made on that basis. Moreover, as apparently applied by the MTA board, the statistics would exclude forever the transportation terminals and stations from compliance with the statutory mandate to provide access to the physically handicapped. The Legislature referred to a 1969 survey showing that 10% of the people in this country were limited in activity by chronic disease or disability (legislative memorandum, McKinney’s Session Laws of NY, 1974, pp 2003-2004). In view of this data, the defendants’ statistics showing that stations are “not likely to be used,” to circumvent the inclusion of the stations as a “public building”, contravenes the intent of the enactment of sections 50 and 51 of the Public Buildings Law and also this court’s application of it in the order dated May 1,1981. Those who will be benefited by the improved accessibility go far beyond the wheelchair-bound. They include other handicapped and the aging, to the extent of more than 10% of the population (legislative memorandum, id.).
On a motion for a preliminary injunction, the movant must demonstrate the likelihood of its ultimate success on the merits; irreparable injury to it if the injunction is not granted; and a balance of the equities in its favor. (Gambar *354 Enterprises v Kelly Servs., 69 AD2d 297; Albini v Solork Assoc., 37 AD2d 835.) Plaintiffs have met this burden.
There is demonstrated a likelihood that plaintiffs will succeed on the merits in their claim that defendants are in violation of sections 50 through 52 of the Public Buildings Law.
Irreparable harm will result, according to plaintiffs, if construction contracts are let and work begun without providing for the elevators. The scope and nature of the alterations will be lessened, to the extent that the work will ease into the clearly exempt category of “work in progress” (Public Buildings Law, § 51), and to the extent that reinsertion of elevators in the modernization work will not be feasible without substantial demolition, rendering an. eventual judgment in plaintiffs’ favor ineffectual.
Defendants contend that it is the authorities which will be damaged in the amount of the costs of the elevators unnecessarily included in designing and . construction, should defendants prevail in the action for a permanent injunction. Further, defendants state that the “overriding considerations of the public interest is the improvement of transit service contemplated by the contracts plaintiffs seek to enjoin.”
A ruling which grants a preliminary injunction is not an adjudication of the merits of plaintiffs’ claim for a permanent injunction, the issues of which must be litigated at trial. (Tucker v Toia, 54 AD2d 322.) The situation here would best be resolved by preserving the status quo, pending a full hearing on the merits. In the interest of the public-at-large in improving the city transportation stations and terminals, the work should go forward to include plans for elevators.
The court is mindful of the current financial difficulties of the MTA. The interest of all parties and the public will be served by a prompt resolution of this action. Therefore, the order to be settled herein should provide for an expedited trial.
Settle order, to be accompanied by an affidavit, affirmation or memorandum regarding an undertaking (CPLR 6312, subd [b]).