**MAINE HUMAN RIGHTS COMMISSION, et al.**

v.

**CITY OF SOUTH PORTLAND.**

Supreme Judicial Court of Maine.

Argued May 6, 1985.

Decided April 25, 1986.

James E. Tierney, Atty. Gen., Robert S. Frank, (orally), Asst. Atty. Gen., Rufus E. Brown, Deputy Atty. Gen., Augusta, for Maine Human Rights Comm.

Tureen & Margolin, Harold L. Lichten, (orally), Portland, for intervenors, Me. Ass'n of Handicapped Persons and Judy Roberts.

William H. Dale, (orally), Corp. Counsel, South Portland, for defendant.

Before McKUSICK, C.J., and NICHOLS, ROBERTS, VIOLETTE, WATHEN, GLASSMAN, and SCOLNIK, JJ.

WATHEN, Justice.

The City of South Portland (South Portland) appeals from a judgment of the Superior Court (Kennebec County) for the Maine Human Rights Commission (Commission), Maine Association of Handicapped Persons (MAHP) and Judy Roberts holding South Portland in violation of 5 M.R.S.A. §§ 4591 and 4592 (1979) of the Maine Human Rights Act (MHRA). On appeal, South Portland argues that (1) the court erred in imposing a requirement of affirmative action and applying the doctrine of reasonable accommodation, (2) the court was clearly erroneous in finding that technology was reasonably available to accommodate the physically handicapped, and (3) the court exceeded its authority in granting relief. We find no error and we affirm the judgment.

## PROCEDURAL BACKGROUND

On March 16, 1983, MAHP filed a complaint with the Commission claiming that South Portland had violated the MHRA. The complaint alleged that the buses used in a newly designed public transportation system were inaccessible to those physically handicapped persons who are unable to mount stairs. On October 17, 1983, the Commission found reasonable grounds to believe South Portland had violated the MHRA. Efforts for informal conciliation failed, and the Commission instituted the present action. 5 M.R.S.A. § 4612(4)(A) (1979). MAHP and Judy Roberts, a member of MAHP residing in South Portland, were granted leave to intervene. The complaints filed in the Superior Court allege that South Portland denied physically handicapped persons their civil rights by denying equal access to a place of public accommodation and engaged in unlawful discrimi-

nation by denying them access to its fixed route buses in violation of sections 4591 and 4592 of the MHRA. The plaintiffs sought declaratory and injunctive relief to make South Portland's fixed route bus system accessible to the physically handicapped. Following a five-day non-jury trial, the Superior Court found that the paratransit service provided handicapped persons was both separate from, and unequal to, the fixed route bus service. Further, the court held that because persons using wheelchairs could have been reasonably accommodated and given access to the fixed route public transit system when it was created, South Portland engaged in discrimination in violation of sections 4591 and 4592 by purchasing buses inaccessible to persons using wheelchairs. The court entered an order requiring that South Portland submit to the court a plan making its fixed route buses accessible to persons using wheelchairs. On November 21, 1984, the court approved the plan and incorporated it in the judgment for the plaintiffs.[1] Execution of the judgment was stayed pending this appeal.

## FACTUAL BACKGROUND

For many years prior to 1981, South Portland, together with Portland and Westbrook, supported its public transportation system through membership in the Greater Portland Transit District (METRO). METRO operated a fixed route bus system in the three cities. None of these buses was equipped with a lift. Additionally, METRO and other agencies provided support for the Regional Transportation Program (RTP), a private, non-profit corporation. Since January 1, 1976, RTP has provided a variety of specialized transportation services in Cumberland County for persons who are elderly, or low income or handicapped.

In the summer of 1981, METRO faced the prospect of a significant cutback in federal support while planning a major cap-

1. The judgment requires, *inter alia,* the installation of wheelchair lifts and two wheelchair tie downs on each of its fixed route buses, institu-

tion of a driver and user training program, and a publicity campaign to increase public awareness about the lift equipped buses.

ital program to construct a new bus garage. METRO projected a 30 to 35 percent decrease in bus service for South Portland and an approximate doubling of South Portland's contributive share of METRO costs. This prospect prompted the South Portland City Council to instruct the city manager and his staff to investigate public transportation options available to South Portland. The investigation led to several public workshop meetings of the city council and culminated in a special city council meeting on December 14, 1981, attended by the public, including handicapped persons and representatives of the MAHP. The city council voted to withdraw from METRO as of January 1, 1983. South Portland then began exploration of options to provide a fixed route transportation service independent of METRO.

After several public meetings it was decided that South Portland would own and operate its own fixed route buses. City officials reviewed materials submitted by five manufacturers of medium size buses, including manufacturers of the so-called "high floor" buses and Skillcraft, the sole manufacturer of a "low floor" bus. A low floor bus may be adapted to allow entry to persons using wheelchairs by a ramp pulled out or powered out from the bus stairs. Persons using wheelchairs may then roll the wheelchair onto the bus. High floor buses may be similarly adapted through the use of a hydraulic lift. With the advice of the Maine Department of Transportation (MDOT), South Portland de-

veloped bid specifications for the purchase of five "high floor" buses without hydraulic lifts.[2] Bids were solicited, and in May, 1982, South Portland initially purchased five high floor "City Bird" buses. At a public hearing in September, 1983, the City Council of South Portland voted to purchase a sixth high floor bus to service the fixed bus routes. Each bus cost approximately $95,000. The cost of all the buses was financed by referendum bond issues. South Portland received no state or federal funds for these purchases.

The fixed route buses began operation as scheduled on January 3, 1983. The bus service consists of four fixed routes and involves about fifty trips a day. One route is across town and three routes connect with downtown Portland. All six buses servicing these routes are high floor buses without lifts. Each of the buses is capable of seating thirty-one passengers. Bus fare is sixty cents. The buses operate from Monday through Saturday exclusive of certain holidays. The hours of service vary on each route and on Saturday. The earliest service on any route is at approximately 6:00 a.m., and the latest approximately 10:00 p.m. In an effort to complement the fixed route bus system and meet special needs, South Portland contracted with RTP and other agencies for paratransit services. Each service is offered without charge or at a discounted charge to the user and is designed to serve the needs of handicapped and elderly persons. There are numerous

2. As it considered the purchase of buses, South Portland explored the possibility of receiving funds, pursuant to 49 U.S.C. §§ 1601–1613, from the Urban Mass Transportation Administration (UMTA). Interpreting federal regulations for UMTA funding of local transit projects, officials from MDOT informed South Portland's Assistant Manager that making fixed route buses accessible to the physically handicapped was "Optional." At the time of South Portland's inquiry, for example, the MDOT advised that the city of Bangor was purchasing some lift equipped buses, while Biddeford, Saco, and Old Orchard Beach were purchasing buses not accessible to persons using wheelchairs.

This advice by MDOT officials was based on a July 20, 1981, amendment of the UMTA regula-

tions that abolished a requirement that all UMTA funded buses be wheelchair accessible. Instead, there was substituted a requirement to allow for the purchase of inaccessible buses if separate "special efforts" were undertaken to provide public transportation for handicapped persons. 46 Fed.Reg. 37,492 (1981) (codified at 49 C.F.R. § 27.77 (1985)). This advice, and South Portland's reliance upon it, was apparently based solely upon the federal regulations, without consideration of responsibilities possibly imposed by state law, including the MHRA. Ultimately, for reasons unrelated to the wheelchair accessibility question, South Portland decided not to pursue UMTA funding.

restrictions on the use of the services, although in the aggregate they represent a relatively comprehensive effort.

During the course of the trial, no empirical evidence was offered by either the plaintiffs or the defendant as to the number of physically handicapped persons residing in South Portland who are unable to mount stairs, or the number of persons using either the fixed route or paratransit service. Some of the persons using wheelchairs found the paratransit service acceptable as a means of transportation and others did not. The Superior Court described the latter group as believing "that the system as currently operated compromises the spontaniety and independence of life which other members of society enjoy." In addition, the court concluded that the paratransit system was not comparable to an accessible fixed route transit system because of the many restrictions on service.

The Superior Court found that when the South Portland bus system was designed, "low floor" and "high floor" buses were available. Both types of buses are basically designed with steps rather than ramps or lifts. The design of a "low floor" bus permits wheelchair access by means of a ramp. A "high floor" bus, however, requires the installation of a hydraulic lift.

Each party adduced extensive, and frequently contradictory evidence concerning the origin, history, performance, initial cost and maintenance cost of each type of bus and of the ramp and lift. The evidence showed, *inter alia*, that at the time South Portland made its bus purchases, Skillcraft low floor buses were operating on fixed route systems in at least two large American cities. Skillcraft buses equipped with non-power ramps were available for approximately the same price that South Portland paid for its first five City Bird buses.[3] By late 1983, low floor buses were in operation or scheduled for operation in the Portland and Bangor areas.

The evidence also showed that hydraulic wheelchair lifts, first developed and installed on transit buses in the early 1970's, are complicated mechanisms, the early versions of which presented many problems of reliability and practical use. Although improved technology has reduced many of these difficulties, wheelchair lifts require maintenance. Lifts may be installed as original equipment or retrofitted to inaccessible buses for prices ranging from $12,000 to $16,000 per bus with annual maintenance cost of each lift ranging from $300 to $1,000.

### SUBSTANTIVE STATUTORY PROVISIONS

The Maine Human Rights Act was first enacted in 1971 and as amended, it now includes a prohibition against discrimination on the basis of physical or mental handicap. 5 M.R.S.A. § 4552 (1979). Discrimination as defined in the MHRA "includes, without limitation, segregate or separate." 5 M.R.S.A. § 4553(2) (1979). In 1975, section 4553 was amended to add subsection 7–A, defining physical or mental handicap as follows:

> "Physical or mental handicap" means any disability, infirmity, malformation, disfigurement, congenital defect or mental condition caused by bodily injury, accident, disease, birth defect, environmental conditions or illness; and also includes the physical or mental condition of a person which constitutes a substantial handicap as determined by a physician or, in the case of mental handicap, by a psychiatrist or psychologist, as well as any other health or sensory impairment which requires special education, vocational rehabilitation or related services.

Subsection 8 of section 4553 includes in the definition of a place of public accommodation "all public conveyances operated on land, water or in the air as well as the stations and terminals thereof." Subchapter V of the Act addresses discrimination in

---

3. The Superior Court found the Skillcraft bus cost $96,500. The exact cost of the City Bird buses is somewhat unclear. As the Superior Court observed, although the city manager testified to a cost of $95,000, the bidding documents reflect a cost of $97,500.

places of public accommodation.[4] The Superior Court based its decision upon sections 4591 and 4592 of that subchapter. Section 4591 provides:

The opportunity for every individual to have equal access to places of public accommodation without discrimination because of race, color, sex, physical or mental handicap, religion, ancestry or national origin is recognized as and declared to be a civil right.

Section 4592 provides in relevant part:

It shall be unlawful public accommodations discrimination, in violation of this Act:

For any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation, to directly or indirectly refuse, withhold from or deny to any person, on account of race or color, sex, physical or mental handicap, religion, ancestry or national origin, any of the accommodations, advantages, facilities or privileges of such place of public accommodation, or for such reason in any manner discriminate against any person in the price, terms or conditions upon which access to such accommodation, advantages, facilities and privileges may depend ...."

## DISCUSSION

### I.

The plaintiffs contend that South Portland's fixed route bus system must be made fully accessible to persons using wheelchairs. They claim that, since the parties agree the buses owned and operated by South Portland are "places of public accommodation" as defined by section 4553(8) of the MHRA, we need look no further than sections 4591 and 4592 to determine that South Portland is in violation of the statute. South Portland argues that subchapter V prohibits disparate treatment and invidious discrimination but does not require affirmative action or accommodation to special needs beyond that which the City provides through the paratransit service.

The parties to this litigation press their opponents' argument to the extreme in an attempt to demonstrate the absence of a logical premise. The plaintiffs ask if they are forever to be cut off from the mainstream of society and be relegated to an inferior, separate, and unequal transportation system, one that stigmatizes them and deprives them of that measure of dignity the Act was designed to protect. South Portland asks, where will it all end? Must they do all that is technologically possible, regardless of expense, to provide accessible buses to a person in an iron lung or a person connected to an artificial life support system? Fortunately, in neither extreme does such a result flow from an accurate analysis of the law.

We have previously addressed subchapter III (pertaining to employment) and sub-

4. 5 M.R.S.A. § 4553(8) (Supp.1985–1986) defines place of public accommodation as follows:

"Place of public accommodation" means any establishment which in fact caters to, or offers its goods, facilities or services to, or solicits or accepts patronage from, the general public; and it includes, but is not limited to: Inns, taverns, roadhouses, hotels, whether conducted for the entertainment or accommodation of transient guests or of those seeking health, recreation or rest, restaurant, eating houses or any place where food is sold for consumption on the premises; buffets, saloons, barrooms or any store, park or enclosure where spirituous or malt liquors are sold; ice cream parlors, confectioneries, soda fountains and all stores where beverages of any kind are retailed for consumption on the premises, retail stores and establishments; dispensaries, clinics, hospitals, rest rooms, bathhouses, barber shops, beauty parlors, theatres, motion picture houses, music halls, airdromes, roof gardens, race courses, skating rinks, amusement and recreation parks, fairs, bowling alleys, golf courses, gymnasiums, shooting galleries, billiard and pool parlors, swimming pools, seashore accommodations and boardwalks, public libraries, garages and gasoline stations; all public conveyances operated on land, water or in the air as well as the stations and terminals thereof; public halls and public elevators of buildings occupied by 2 or more tenants or by the owner and one or more tenants.

chapter IV (pertaining to housing) of the MHRA. We have not, heretofore, been called on to interpret subchapter V of the MHRA, 5 M.R.S.A. §§ 4591–4594–A (1979 & Supp. 1985–1986). The brief filed on behalf of MAHP correctly identifies certain unique circumstances involved in discrimination against handicapped persons. Rarely, in such a case, is there invidious bias on the part of the proprietor of a place of public accommodation. Rather, such discrimination ordinarily results from the erection or maintenance of physical barriers that prevent the handicapped person from gaining entrance. Although the proprietor may not consciously intend to discriminate, the barrier excludes as effectively as would an intentional policy.[5]

The MHRA addresses the plight of the physically handicapped in section 4552 in the following terms:

> To protect the public health, safety and welfare, it is declared to be the policy of this State to keep continually in review all practices infringing on the basic human right to a life with dignity, and the causes of such practices, so that corrective measures may, where possible, be promptly recommended and implemented, and to prevent discrimination in employment, housing or access to public accommodations on account of race, color, sex, physical or mental handicap, religion, ancestry or national origin and in employment, discrimination on account of age; and to prevent discrimination in the extension of credit on account of age, race, color, sex, marital status, religion, ancestry or national origin.

The legislative statement of policy recognizes that it is not possible to require the immediate removal of all barriers. The goal is the establishment of a continuing process of review to permit, *where possible*, the application of corrective measures. More explicit confirmation of the legislative purpose is provided by the statement of fact accompanying the 1974 amendment adding physically handicapped persons as a protected class under the MHRA. The document states that the MHRA was intended "to guarantee physically handicapped persons the fullest possible participation in the social and economic life of the State." L.D. 2058, Statement of Fact (106th Legis.1974). The substantive statutory provisions involved in this case must be read in light of the unique societal problems of the handicapped and the legislative goal of matching progress with opportunity.

The rights of handicapped persons are given meaning and form in absolute terms under 5 M.R.S.A. §§ 4591 and 4592. Equal access is declared to be a civil right and discrimination is prohibited with respect to public accommodations. When faced with a similar "airtight prohibition" against religious discrimination, we construed the Act to preserve the flexibility suggested by the legislative statement of purpose. *Maine Human Rights Commission v. Local 1361 United Paperworkers International Union, AFL–CIO*, 383 A.2d 369, 378 (Me. 1978). In that particular case, the Commission had adopted an interpretative guideline imposing the obligation on the employer "to make reasonable accommodations to the religious needs of employees ... where such accommodations can be made without undue hardship to the conduct of the employer's business". *Id.* at 376. In responding to the union's challenge to the require-

---

**5.** With regard to § 504 of the Rehabilitation Act of 1973, the United States Supreme Court has observed:

> Discrimination against the handicapped was perceived by Congress to be most often the product, not of invidious animus, but rather of thoughtlessness and indifference—of benign neglect. Thus, Representative Vanik, introducing the predecessor to § 504 in the House, described the treatment of the handicapped as one of the country's "shameful oversights," which caused the handicapped to live among society "shunted aside, hidden, and ignored." Similarly, Senator Humphrey, who introduced a companion measure in the Senate, asserted that "we can no longer tolerate the invisibility of the handicapped in America...."

*Alexander v. Choate,* 469 U.S. 287, —, 105 S.Ct. 712, 718, 83 L.Ed.2d 661 (1985) (citations and footnotes omitted).

ment of reasonable accommodation, we found it to be "a reasonable construction of the Maine Act," and stated:

> One of the purposes of [the guideline] is to breathe flexibility into an otherwise airtight prohibition against religious discrimination, by providing that a reasonable accommodation need not be made if it would amount to undue hardship. We find nothing unreasonable in such an interpretation.

*Id.* at 378.

Our opinion in *Local 1361* is strengthened by the fact that the United States Supreme Court has employed a similar rationale. In an analogous context, the Supreme Court stated:

> We do not suggest that the line between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons always will be clear. It is possible to envision situations where an insistence on continuing past requirements and practices might arbitrarily deprive genuinely qualified handicapped persons of the opportunity to participate in a covered program. *Technological advances can be expected to enhance opportunities to rehabilitate the handicapped or otherwise to qualify them for some useful employment. Such advances also may enable attainment of these goals without imposing undue financial and administrative burdens upon a state. Thus situations may arise where refusal to modify an existing program might become unreasonable and discriminatory.*

*Southeastern Community College v. Davis,* 442 U.S. 397, 412–413, 99 S.Ct. 2361, 2370, 60 L.Ed.2d 980 (1970) (emphasis supplied). *See also Alexander v. Choate,* 469 U.S. 287, ——, 105 S.Ct. 712, 720, 83 L.Ed.2d 661 (1985).

The tension between the legislative statement of policy and the substantive prohibition mandates an application of the doctrine of reasonable accommodation to claims of discrimination in public transportation based on physical handicap. Only in this manner is it possible to distinguish between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons. The requirement of reasonable accommodation is both rational and meaningful. The obligation of the proprietor of a place of public accommodation with regard to physical barriers, is limited to that which can reasonably be accomplished without undue financial or administrative burden. The rights of the handicapped are advanced as technological change removes the justification for the erection or maintenance of barriers. When activated by a process of continuous review, as envisioned by the Legislature, the statutory prohibition is designed to insure that human dignity keeps pace with technological advancement and opportunity.

In ruling that South Portland violated sections 4591 and 4592, the presiding justice made the following findings of fact:

> Technology was undisputably available in 1981 and 1982 and is available today to accommodate the physically handicapped on fixed route public transit buses. Further, this accommodation could be made at a cost not significantly greater than the cost of inaccessible buses and without significant disruptions to bus route operations.

We conclude that the court committed no legal error in interpreting subchapter V in accord with the doctrine of reasonable accommodation.[6] The creation of a physical

---

6. In one respect the decision of the Superior Court deviates from the analysis set forth in this opinion. The Superior Court found that a *prima facie* case of discrimination was established solely by the evidence that wheelchair users were effectively excluded from the fixed route bus system and forced to rely on a separate system. The Superior Court considered the pos-

sibility of accommodation and hardship only in determining whether to grant relief. Under our analysis the creation of a physical barrier constitutes an act of discrimination only if it could have been avoided without imposing undue hardship. Although the *prima facie* standard may appropriately be used as a burden shifting device, the concept of accommodation is never-

barrier in circumstances where that result could reasonably have been avoided without financial or administrative burden, constitutes an illegal act of discrimination. That result is not altered by the fact that a separate paratransit system is also provided. It is commendable that South Portland provides service to all residents, but that does not relieve the City from its obligation to avoid discriminatory practices where possible. Even if ramps or lifts are provided on the bus routes, it is certain that not every handicapped person will be able to make use of them. The law, however, protects the rights of the individual. The plaintiffs in this case have demonstrated a violation of their civil rights. They cannot be relegated to a separate system merely because the relief they seek does not solve the multitude of problems experienced by handicapped persons as a class.

## II.

■■■ South Portland next challenges the factual basis of the court's decision. It interprets the decision as holding that the city could have ordered without undue financial or administrative burden either a low floor bus, or a high floor bus equipped with a reliable wheelchair lift, when it designed its transit system. The city claims that in both alternatives the court was clearly erroneous and the findings should be set aside. In considering factual findings on appeal, we employ a rigorous standard of review. Such findings will not be deemed clearly erroneous unless there is *no* competent evidence to support them. *Harmon v. Emerson*, 425 A.2d 978, 982 (Me.1981). We need consider only the first alternative, the reasonable availability of the low floor bus. The record does contain conflicting testimony. It cannot be said, however, that there is no competent evidence to support the presiding justice's con-

clusion that low floor buses were reasonably available and could have been used without imposing any undue financial or administrative burden. That finding alone supports the court's finding of discrimination. We recognize that the second alternative would present a more difficult question owing to the burden of additional expenses involved in acquisition and maintenance. It must be borne in mind at this stage in our analysis that the findings relate to the issue of discrimination *vel non*. The fact that the Superior Court ordered the installation of wheelchair lifts as relief for an established act of discrimination, does not suggest that the same measure was required initially as a reasonable accommodation.

## III.

Finally, South Portland contends that insofar as the Superior Court ordered relief that went beyond the installation of wheelchair lifts, the court abused its discretion. The city notes that the court found no evidence of intentional discrimination against the handicapped, that many other municipalities have purchased buses without wheelchair lifts in the last few years, and that the solution to the transportation needs of the handicapped is a subject of legitimate debate. In view of these facts, the city argues that the judgment is punitive and goes beyond the scope of subchapter V.

■■■ The court ordered training for drivers and users, and measures to assure that adverse attitudes do not frustrate the purpose behind the judgment. Once the court has found a violation of the Act, it is free to fashion a remedy to prevent further violations. *See Maine Human Rights Commission v. City of Auburn*, 425 A.2d 990, 995 (Me.1981). The relief ordered by

theless part of the decisional framework for determining liability. In *Percy v. Allen*, 449 A.2d 337 (Me.1982), we stated:

Therefore, at the initial, liability phase in which the legality of the defendants' conduct is assessed, plenary consideration must be giv-

en to the issue of accommodation, regardless of the nature of the requested relief.

*Id.* at 346. Because, the Superior Court made all necessary findings of fact in the case, the technical error in the line of analysis does not result in an erroneous judgment.

the court is reasonable. Two expert witnesses testified that without such instruction, any lift-equipped bus system is almost doomed to fail. The city's negative attitude with regard to lifts is amply demonstrated in the record. We find no abuse of discretion.

The entry is:

Judgment affirmed.

ROBERTS, VIOLETTE and SCOLNIK, JJ., concurring.

GLASSMAN, Justice, with whom McKUSICK, Chief Justice, and NICHOLS, Justice, join, dissenting.

I must respectfully dissent. Subchapter V of the Maine Human Rights Act (MHRA), 5 M.R.S.A. §§ 4591–4594–A (1979 & Supp. 1985–1986), does not disclose any legislative intent to make unlawful the operation of a fixed route system of buses inaccessible to persons using wheelchairs when, as here, there is no evidence of invidious motivation, and substantial alternative and supplementary services are provided.[1] In addition, the court's decision invites the judiciary to engage in ad hoc cost-benefit analysis both in defining unlawful public accommodations discrimination and in fashioning a remedy. Thus, the court places in the hands of the judiciary decisions that are more appropriately entrusted to the Legislature.

The reasoning of the court in holding South Portland's public transit system un-lawful is flawed. The court does not analyze the language or legislative history of section 4591 and 4592. Instead, the court applies the principle of "reasonable accommodation" to these sections to determine whether the public transit system is unlawful:

The tension between the legislative statement of policy and the substantive prohibition mandates an application of the doctrine of reasonable accommodation to claims of discrimination in public transportation based on physical handicap. *Only in this manner is it possible to distinguish between a lawful refusal to extend affirmative action and illegal discrimination against handicapped persons.* The requirement of reasonable accommodation is both rational and meaningful. *The obligation of the proprietor of a place of public accommodation with regard to physical barriers, is limited to that which can reasonably be accomplished without undue financial or administrative burden.* The rights of the handicapped are advanced as technological change removes the justification for the erection or maintenance of barriers.

*Supra* at 955–956 (emphasis added).

In reaching this result the court relies on dicta in two United States Supreme Court cases construing section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1982). *See Southeastern Community College v. Davis,* 442 U.S. 397, 412–13, 99 S.Ct. 2361,

---

1. South Portland's public transportation system consists of two major components: 1) services provided by fixed route buses, without wheelchair lifts, owned and operated by South Portland, and (2) paratransit services obtained by contract between South Portland and the Regional Transportation Program (RTP) and provided by buses, with wheelchair lifts, not owned or operated by South Portland. The paratransit service provided is literally "door-through-door." The driver of the bus will give the user of the service necessary assistance in getting out of or into a building that is the pick-up point or destination, in or out of the bus, and in properly securing safety devices within the bus.

After South Portland withdrew from METRO, the paratransit program continued at the same level of service as had previously existed until June 1, 1985, when South Portland contracted with RTP for additional services for handicapped persons.

South Portland also has a brokerage program service with RTP. This program purchases transportation services on fixed route buses for elderly, handicapped or low income persons. For the fiscal year 1984–85, South Portland paid RTP approximately $13,500 for this program. RTP received funds from a variety of other sources, including the Department of Human Services, Bureau of Social Services, and Bureau of Maine's Elderly, resulting in a purchase from South Portland of approximately $55,700 worth of bus tickets for use on its fixed route buses.

2370, 60 L.Ed.2d 980 (1979); *Alexander v. Choate*, —— U.S. ——, 105 S.Ct. 712, 718–20, 83 L.Ed.2d 661 (1985). The reliance is misplaced, not only because the language of section 504 is dissimilar to that of subchapter V, but more significantly because the cases reach results directly contrary to the result the court strains to reach in the instant case. *Southeastern Community College*, 442 U.S. at 413, 99 S.Ct. at 2370 (section 504 does not require an educational institution "to lower or to effect substantial modifications of standards to accommodate a handicapped person"); *Alexander*, 105 S.Ct. at 721–25 (limiting Medicaid hospital coverage to `14 days does not deny handicapped access to Medicaid services or discriminate in the provision of benefits).

More fundamentally, the court errs in its use of the principle of reasonable accommodation to make the initial determination whether South Portland's public transit system is unlawful. The principle of reasonable accommodation is properly invoked to determine the scope of remedial relief. *See Percy v. Allen*, 472 A.2d 432 (Me.1984) (affirmative defense of a bona fide occupational qualification requires defendant prove infeasibility of remedy); *Percy v. Allen*, 449 A.2d 337, 341–46 (Me.1982) (same); *Maine Human Rights Commission v. Local 1361, United Paperworkers Union*, 383 A.2d 369, 375–78 (Me.1978) (after plaintiff establishes prima facie unlawful discrimination, defendant must show that there is no accommodation that is not undue hardship).[2] The application of the reasonable accommodation principle represents essentially a factual inquiry into what is "reasonable" under all the circumstances and must of necessity involve a measure of judicial discretion. *Cf. Percy*, 472 A.2d at 433–34; *Local 1361*, 383 A.2d at 378–81; *Maine Human Rights Commission v. City of Auburn*, 408 A.2d 1253, 1261 (Me.1979) (any remedy under the MHRA is granted only through the exer-

cise of the sound discretion of the court). By importing the principle into the initial finding of unlawful discrimination, the court has made the initial finding as discretionary as the fashioning of remedial relief. When both the right and the remedy become discretionary, the judiciary has usurped the legislative function.

I turn then to examine the MHRA to determine whether the decision of the Superior Court may be affirmed on any alternative basis. I note preliminarily that there is no statutory requirement that South Portland operate a public transit system. This determination is properly left to the respective towns or cities. In the instant case, South Portland decided to establish a public transit system that included fixed route buses owned and operated by the city and the paratransit services purchased from RTP. By its determination to provide a public transit system, South Portland became subject to the provisions of subchapter V pertaining to public accommodations.

To determine the legislative intent underlying the separate provisions of subchapter V, subchapter V must be considered in its entirety and in its relationship to the rest of the Act. *See Faucher v. City of Auburn*, 465 A.2d 1120, 1124 (Me.1983); *Frost v. Lucey*, 231 A.2d 441, 446 (Me.1967). The statutory history of Maine's public accommodations provisions is also relevant as an aid in ascertaining the legislative intent. *State v. Norton*, 335 A.2d 607, 613 & n. 3 (Me.1975); *Finks v. Maine State Highway Commission*, 328 A.2d 791, 797 (Me.1974).

Subchapter V begins with a legislative declaration of principle: "The opportunity for every individual to have equal access to places of public accommodation without discrimination" is "declared to be a civil right." § 4591. Section 4592 enforces this civil right by defining "unlawful public accommodations discrimination" of two types

---

**2.** The guidelines set forth in subchapter III of the MHRA dealing with unlawful employment discrimination should be noted. *See* 5 M.R.S.A. §§ 4572, 4572–A, 4573, 4574 (1979 & Supp.1985–

1986). No comparable guidelines are provided in subchapter V dealing with unlawful discrimination by a public transit system. *See* 5 M.R.S.A. § 4592 (1979).

in two separate paragraphs. By its second definitional paragraph section 4592 prohibits any person from advertising that a place of public accommodation will deny its "accommodations, advantages, facilities and privileges" on the basis of race, color, sex, physical or mental handicap, religion, ancestry or national origin. In short, the second paragraph prohibits the publication of an intention to discriminate but does not require any affirmative measures. The plaintiffs do not contend that South Portland has violated this provision.

By its first definitional and core paragraph section 4592 prohibits any place of public accommodation from withholding its "accommodations, advantages, facilities or privileges" from any person on grounds of race, color, sex, physical or mental handicap, religion, ancestry or national origin, or discriminating against any person in the terms "upon which access to such accommodations, advantages, facilities and privileges may depend." The plaintiffs' contention is that South Portland's transit system violates this paragraph of section 4592.

Section 4592 derives from predecessor provisions that antedate the enactment of the MHRA. The second definitional paragraph of section 4592 derives from a statute enacted in 1917. P.L.1917, ch. 225 prohibited a place of public accommodation, including a public conveyance, from publishing an intention to discriminate on grounds of religion, class or nationality. In 1971 this provision was incorporated into the MHRA. P.L.1971, ch. 501, § 1 (codified as amended at 5 M.R.S.A. § 4592 (1979)).

In 1959, the Legislature enacted the predecessor provision to the first definitional paragraph of section 4592 to prohibit places of public accommodation from discriminating on the basis of race, color, religion, ancestry or national origin. P.L.1959, ch. 282. In 1971 this provision was also incorporated into the MHRA. P.L.1971, ch. 501, § 1 (codified as amended at 5 M.R.S.A. § 4592 (1979)). Subsequently, in 1974, the Legislature added physically handicapped persons as a protected class under section 4592, but did not otherwise restructure the section.

The legislative history of section 4592 indicates that this enforcement provision is intended to operate in a case of alleged discrimination against physically handicapped persons as it operates in other cases of discrimination. Discrimination because of race, national origin, religion, age or sex results primarily from stereotyping attitudes that are embodied in practice. Discrimination against a physically handicapped person results in part from this invidious stereotyping. Insofar as such discriminatory stereotyping is embodied in practice, the law prohibits it. *See Maine Human Rights Commission v. Canadian Pacific Ltd.*, 458 A.2d 1225, 1231 (Me.1983) (the MHRA "is intended to prevent discrimination against the physically handicapped based on unfounded stereotyping"). However, physical barriers also hamper the efforts of certain physically handicapped persons as they seek to participate fully in society on equal terms with other persons. Although the legislative history and present language of section 4592 supports the conclusion that the practice of discriminatory stereotyping is prohibited and affirmative measures may be ordered to effect attitudinal changes, there is nothing that prohibits physical barriers. Without an express statutory standard of such prohibition, a construction of section 4592 that required affirmative measures to eliminate physical barriers would represent a major departure from this court's prior decisions construing the MHRA and from the corpus of antidiscrimination law. *See Marsh v. Edwards Theatres Circuit, Inc.*, 64 Cal. App.3d 881, 134 Cal.Rptr. 844 (1976) (a provision requiring "full and equal access" for the physically handicapped does not require structural modifications); *Eastern Paralyzed Veterans Association v. Metropolitan Transportation Authority*, 79 A.D.2d 516, 433 N.Y.S.2d 461 (1980) (mem.) (the New York statute prohibiting public accommodation discrimination does not mandate "special efforts" to accommodate

the disabled).[3]  *Cf. Atlantis Community, Inc. v. Adams*, 453 F.Supp. 825, 832 (D.Colo.1978) (contrasting racial discrimination cases with claims of discrimination against physically handicapped persons).

The conclusion that section 4592 does not define South Portland's transit system as unlawful is reenforced by consideration of the nature of transportation.[4]  As David Lewis, an economist and expert witness for South Portland, testified, consumer demand for transportation is a "derived demand." That is to say, unlike employment, education, or housing that are ends in themselves though also means to a productive and satisfying life, public conveyance or transportation is not desired for its own sake, but purely as one method of movement to assist in obtaining other ends. The important goal of transportation is to be able to reach a destination. The plaintiffs' expert witness, Dennis Cannon, a specialist with the United States Architectural and Transportation Barriers Compliance Board, essentially agreed, testifying that the design of a transit system and the means employed are less important than the benefits provided, that is, the frequency and volume of transportation services.

In the instant case the fixed route buses and the paratransit service are alternative methods providing access to the metropolitan area so that users of these services may reach their destinations. Through the paratransit programs South Portland is providing substantial services to make a method of public transportation available on an individualized basis and arguably to greater numbers of physically handicapped persons than would the relief demanded by the plaintiffs.[5]

An examination of the remaining provisions of subchapter V fully supports the position that section 4592 is not intended to eliminate physical barriers. In the same 1974 act that added physically handicapped persons as a protected class, the Legislature provided for specific affirmative requirements for buildings and facilities, but not for public conveyances. P.L.1973, ch. 705, § 12 (codified as amended at 5 M.R. S.A. § 4593 (Supp.1985–1986)). Section 4593 and the subsequently enacted sections 4594 and 4594–A [6] provide detailed requirements, precisely differentiated by date of construction or remodeling, for making

3. The plaintiffs in *Eastern Paralyzed Veterans* sought to compel the public defendants to buy buses and to construct terminals that were accessible to persons using wheelchairs and to semiambulatory persons. The court dismissed the plaintiffs' cause of action insofar as it was based on the New York statute prohibiting public accommodation discrimination. 79 A.D.2d at 517–18, 433 N.Y.S.2d at 462–63. The language of the statutory provisions construed in *Eastern Paralyzed Veterans* is almost identical to the language of the comparable Maine provisions. *Compare* N.Y.Exec.Law § 292(9) (Consol.1983) (defining place of public accommodation) and § 296(2)(a) (defining unlawful public accommodation discrimination) *with* 5 M.R.S.A. § 4553(8) and § 4592. The court on remand in *Eastern Paralyzed Veterans* enjoined new construction at 10 terminals that did not include elevators. In so doing the court applied statutes specifically requiring structural modifications to make public buildings accessible to physically handicapped persons. 117 Misc.2d 343, 458 N.Y.S.2d 815 (1982).

4. *Cf. Lagasse v. Hannaford Bros. Co.,* 497 A.2d 1112, 1117 (Me.1985) (statutes "take on vitality

only when read in the transforming light of a real life situation, and then the question becomes what the legislature intended or reasonably would intend the words of that statute to mean when addressed to that particular situation").

5. Statistical evidence presented at trial tended to show that based on usage in cities of comparable size, lift-assisted boardings of buses might be expected to range between one and 5.3 per day in South Portland whereas the daily usage of paratransit services serving the physically handicapped would approximate some 37 one-way trips. *See also Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority,* 718 F.2d 490, 491 (1st Cir.1983) (53 buses out of a fleet of 267 operating throughout Rhode Island were equipped with lifts; there were 488 one-way trips by persons using wheelchairs in the year 1980 and 605 in the year 1981).

6. *See* P.L.1981, ch. 334, § 3 (codified at 5 M.R. S.A. § 4594 (Supp.1985–1986)); P.L.1983, ch. 437, § 5 (codified at 5 M.R.S.A. § 4594–A (Supp. 1985–1986)).

"any building or facility" usable by a physically handicapped person.[7] When the Legislature intended subchapter V to embrace affirmative action to eliminate physical barriers, it so provided under sections 4593, 4594, and 4594–A.

The conclusion that section 4592 does not impose affirmative requirements to eliminate physical barriers is further reenforced by an examination of subchapter IV of the MHRA pertaining to fair housing. Section 4581, like section 4591, declares a broad principle: "[t]he opportunity ... to secure decent housing ... without discrimination" is "declared to be a civil right." Section 4582, the parallel provision to section 4592, enforces this civil right by defining "unlawful housing discrimination." The definition of "unlawful housing discrimination" is stated in terms of a listing of prohibited conduct. Prior to 1983 the only affirmative requirement to eliminate physical barriers in housing appeared in subchapter V as part of section 4593. § 4593(1) [2d para.] (repealed 1983) (1% of living units in any public housing must be accessible to a person using a wheelchair). In that year the Legislature added a new final paragraph to section 4582. P.L. 1983, ch. 437, § 3. This new paragraph, further defining "unlawful housing discrimination," requires public housing or any housing financed in whole or in part by public funds that is constructed or remodeled on or after January 1, 1984, to provide, out of every twenty living units, one that is accessible to handicapped persons.

Thus, an examination of both subchapters IV and V demonstrates that when the Legislature intended to impose affirmative requirements to eliminate physical barriers, it so provided. This court should not read affirmative requirements for public conveyances into section 4592 when the statute provides no such express provision.[8] *See Marsh,* 64 Cal.App.3d at 891–92, 134 Cal. Rptr. at 850 (if the legislature had intended an equal access statute to require structural modifications, then the legislative inclusion of structural modification requirements in a different statute would be redundant).

The plaintiffs additionally contend that the operation of fixed route buses inaccessible to persons using wheelchairs separates this group of the physically handicapped and therefore constitutes discrimination "in the price, terms or conditions upon which access" to the public transit system depends. The plaintiffs point to the statutory definition of discrimination as including segregation or separation. § 4553(2). The Legislature, however, provided in sections 4582, 4593, 4594, and 4594–A for separate accommodations to meet the needs of physically handicapped persons. The limited accommodation required for buildings and facilities in fact separates persons using wheelchairs from other persons. *See, e.g.,* § 4582 (one out of every 20 units of public housing must be accessible to handicapped persons); § 4593(1) (places of public accommodation must have one public walk, one primary entrance, and one rest room stall, each of particular dimensions).[9] Sections 4593,

---

**7.** While "facility" is not defined, the Legislature provided that a "facility" as well as a building must meet requirements pertaining to walks, entrances, restrooms, and tactile warnings on doors to hazardous areas. §§ 4593(1), (2); 4594(2); 4594–A(2). Whatever is included under "facility," it clearly does not cover means of public conveyance. Nor do the plaintiffs contend that a "facility" is a means of public conveyance.

**8.** The Legislature has imposed specific affirmative requirements for public transportation upon the Department of Transportation. 23 M.R.S.A. § 4209 (1980 & Supp.1985–1986). The Department shall select regional public transportation agencies throughout the state. *Id.* § 4209(1). These agencies shall plan for "a permanent and effective public transportation service, with particular regard to low income, elderly and handicapped residents." *Id.* § 4209(2)(B).

**9.** Similarly, section 4594(2) imposes requirements based on the specifications of the American National Standards Institute, *Specifications for Making Buildings and Facilities Accessible to and Usable by Physically Handicapped Persons* (ANSI A 117.1–1980). These specifications generally require one "route" through a building

4594 and 4594–A provide for access by persons using wheelchairs to a public building and facilities within the building by providing a specialized entrance to and route through the building as one of its entrances and interior routes. In the instant case, South Portland has made the urban area and destinations therein accessible to persons using wheelchairs by providing specialized transportation services as one part of its transit system. Thus it cannot be found that the provisions of subchapter V ban such separation in public transportation while authorizing it in other public accommodations such as buildings and other facilities.

The structuring of a public transportation system to meet the needs of physically handicapped persons and achieve thereby the desirable goal of enriching society by helping physically handicapped persons to participate more easily in the social, economic, cultural and political affairs of a community is an extremely difficult task. For the courts to assist properly in the achievement of this goal, the applicable statutes must provide some legal standard or guidelines from which the judiciary can discern the rule of law that must be administered. Even if one accepts the court's rationale that unlawful discrimination is established by the absence of reasonable accommodation, its finding of unlawful discrimination can only be reached by restricting the application of this rationale to the fixed route buses and ignoring the remainder of South Portland's public transit system.

In the instant case South Portland after extensive deliberation determined on a particular package of transportation services as most reasonably accommodating the transportation needs of its residents. An-

other court has characterized the nature of such a decision in the following words:

Providing public transportation for the mobility disabled is an extraordinarily difficult undertaking. It requires more than an analysis of available technology to determine what is reasonably safe, reliable and effective. It also involves the identification of those to be served and their differing needs. The record in this case shows that much more is involved than wheelchair accessibility. The statutory definition of disabled ... includes more than those who are confined to wheelchairs. Indeed, ... there are differing configurations of wheelchairs which significantly affect the use of hydraulic lifts. There are also questions of priorities in making public expenditures and conflicting needs.

*Atlantis Community,* 453 F.Supp. at 830. When reviewing the challenged actions of a unit of local government, this court gives significant weight to its reasoned judgment. *See Roy v. City of Augusta,* 414 A.2d 215, 217 (Me.1980); *see also Rhode Island Handicapped Action Committee v. Rhode Island Public Transit Authority,* 718 F.2d 490, 500 (1st Cir.1983). Judicial restraint is a particular requisite when the challenged decision involves the weighing of interrelated technological, social, and fiscal considerations. Statutory rights are not to be measured, as the court suggests, solely by a judicial evaluation of changing technology. *See Atlantis Community,* 453 F.Supp. at 832. Even when such rights are clearly defined, a court must be reluctant to engage in an ad hoc cost-benefit analysis in fashioning a remedy. *See Rhode Island Handicapped Action,* 718 F.2d at 498. The Legislature offers the appropriate forum to evaluate the interrelated considerations and to develop policies to meet changing social needs. The provisions under the MHRA delineating technical building requirements represent a legit-

accessible to persons using wheelchairs and accessible doors and toilet stalls along that one route. *Id.* §§ 4.3.2, 4.3.9, 4.13.1, 4.17.1. Section 4594–A(2) imposes as requirements for new construction the standards adopted pursuant to

25 M.R.S.A. §§ 2701–2704 (Supp.1985–1986). These standards require, *inter alia*, one public walk of particular dimensions, one elevator, and one toilet stall of particular dimensions. *Id.* § 2702(2), (6), (8).

imate exercise of this legislative power. *See* 5 M.R.S.A. §§ 4582, 4593, 4594, 4594–A (Supp.1985–1986). Moreover, by defining what is unlawful discrimination, these sections help to define the scope of the relief available under the MHRA. *See* § 4613. The Legislature and not the courts has the chief responsibility to identify when the design of a public transportation system amounts to unlawful public accommodation discrimination and to determine the scope of any necessary affirmative action.

Because I find no basis for holding that subchapter V of the MHRA defines South Portland's public transit system as unlawful public accommodations discrimination against those persons using wheelchairs, I would vacate the judgment and remand to the Superior Court for entry of judgment for South Portland.